**ACG, INC., Plaintiff–Appellant,**

v.

**SOUTHEAST ELEVATOR, INC., and Murphy–Adcock Elevator Shaft Drilling, Defendants–Appellees.**

Court of Appeals of Tennessee, Eastern Section.

July 13, 1995.

Permission to Appeal Denied by Supreme Court Oct. 30, 1995.

Ashley L. Ownby, Cleveland, for appellant ACG, Inc.

Thomas L.N. Knight, Grisham, Knight & Booper, Chattanooga, for appellee Southeast Elevator, Inc.

## OPINION

McMURRAY, Judge.

In this contract dispute, the trial judge found that ACG, Inc., the general contractor for construction of the "Courts Building" in Chattanooga, had breached its duty to Southeast Elevator, a subcontractor, and awarded damages. On appeal ACG argues, *inter alia*, that the trial court erred in finding that it breached its contract by violation of an implied condition of good faith. We affirm the trial court.

The chancellor issued his memorandum opinion and order. Our view of the case persuades us that the memorandum opinion and order of the chancellor accurately reflects the facts of the case. We therefore, adopt his introductory statement and the statement of the facts which in pertinent part are as follows:

## INTRODUCTION

... Each of the parties were involved with the construction of the Courts Building in Chattanooga, Hamilton County, Tennessee. (1989–1991). Two suits were filed in regard to this dispute and there were

counterclaims and/or cross-claims filed in each. Thus, the court will refer to the parties in the capacity in which they were involved with the construction of the Courts Building

Monies are sought against ACG, Inc., the general contractor, by both Southeast Elevator, Inc., a subcontractor, and Murphy–Adcock Elevator Shaft Drilling, a drilling contractor brought in to expedite necessary drilling work. Murphy–Adcock also makes a claim for payment against Southeast either jointly or alternatively. Both ACG and Southeast concede Murphy–Adcock should be paid, but each contends the other should be responsible for payment. Southeast Elevator also seeks recovery from ACG the retainage that was never paid to it and seeks $16,000.00 in damages.[1] ACG, Inc., seeks indemnity from Southeast in the event it is held liable to Murphy–Adcock. It also claims that it is entitled to attorney's fee from Southeast.

Murphy–Adcock was not involved in the original contract nor any of the subcontracts on this project. It was brought into the work at a later time upon the direct request of Southeast with the knowledge and, at least, acquiescence and the indirect request of ACG, Inc. It performed its specialized drilling work on three of the elevator sites in the Courts Building expeditiously and without complaint from any other involved parties.

### FACTS

In June, 1989, ACG, Inc., was awarded the general contract to construct the Hamilton County Courts Building. It entered into a subcontract with, among others, Southeast Elevator Company, Inc. This subcontract involved the necessary work to install five hydraulic elevators in the building for a total contract price of $229,346.00.

The installation of the hydraulic elevators required the drilling of rather deep (45'–65') holes into the ground for the hydraulic cylinders. Such drilling can be accomplished by "outside" drilling prior to the construction of the building or by "inside" drilling after the building has been roofed and dried in. "Outside" drilling is performed early in the overall construction and must be done soon after the site is brought to grade and before any real construction begins on the structure itself. It can be done by a well drilling rig mounted on the back of a truck which is driven onto the site over the location of the hole to be drilled. But it cannot be performed if portions of the building have been completed so as to block or substantially impede the drilling rig's access to the site of the holes to be dug. It must then be done by inside drilling with a portable drill rig suspended in the constructed elevator shaft.

After signing its subcontract, Southeast Elevator made arrangements to obtain the necessary holes by "outside" drilling by an experienced well driller, Mr. Jack Terry.

\* \* \* \* \* \*

Despite Southeast Elevator's expectations, construction proceeded to the point where outside drilling became impossible. No notice had been given Southeast Elevator to begin its work.

\* \* \* \* \* \*

Due to the progress at the job site, Southeast Elevator, Inc. had to wait until the building was erected before they could commence drilling the necessary cylinder holes.

\* \* \* \* \* \*

Southeast Elevator, Inc. had done some inside drilling previously at other sites, but investigated the possibility of bringing in another contractor to do the inside drilling when they realized outside drilling was no longer possible. Mr. Clark, President of Southeast Elevator, Inc., contacted Murphy–Adcock and ascertained that it had the capability to perform inside drilling

---

1. The contract provides that on or about the 10th day of each month, the contractor [ACG] will pay the subcontractor [Southeast Elevator] ninety (90%) of the value of labor and materials incorporated by the subcontractor in the work and of materials stored on the job site in a manner acceptable to the contractor with the balance to be paid upon completion of subcontractor's work, acceptance by the owner, etc. . . . .

Apparently the remaining Ten (10%) is the "retainage." (Footnote Added).

much more efficiently and quickly than Southeast. The price, however, would have been $230.00 per foot and Southeast Elevator, Inc. had made its original bid based upon a cost factor of $120.00 per foot that Mr. Terry had given.

At the appropriate time, Southeast Elevator commenced inside drilling and it completed two of the holes before starting the hole for elevator number 3. The inside drilling process is slow and rock was encountered in the holes and such had not been anticipated. Thus, Southeast got behind schedule. At the same time, the entire project was months behind schedule and ACG was putting pressure on the various subcontractors, including Southeast Elevator, to expedite the work. Southeast Elevator advised Mr. Middleton, Vice President of ACG, of the capabilities of Murphy–Adcock to drill the holes much faster than it could. The preponderance of the evidence, at the very least, establishes that Mr. Middleton was advised of the prices of Murphy–Adcock and of the fact that Southeast Elevator would be unable to pay the prices of Murphy–Adcock. Nevertheless, Mr. Middleton told Mr. Clark to get Murphy–Adcock on the job.

\* \* \* \* \* \*

Murphy–Adcock was promptly contacted and brought on to the job; it finished drilling the holes in a reasonable amount of time. Considerable difficulties were encountered, however, at the hole for number 3 which had been started by Southeast Elevator, Inc. Such was out of plumb and it required three additional drillings by Murphy–Adcock to make the holes perfectly in line. When an "out of plumb" hole occurs, usually the drilling contractor suffers the loss of the increased expense. Hole # 3 had to be "straightened" by Murphy–Adcock and additional "daily" charges were made as it was not the original contractor.

Murphy–Adcock stated that it came on to the job site to drill the holes because of the representations by Southeast Elevator that ACG would pay the bill or reimburse them for their services. Nevertheless, after Murphy–Adcock finished its drilling, it made out invoices to Southeast Elevator and mailed them to Southeast Elevator. Rather than forwarding the invoices to ACG and requesting payment thereof, Southeast Elevator submitted such as a part of an application, or request, for a change order. Another complicating factor is that Murphy–Adcock submitted two different invoices for the straightening and drilling of hole number 3, and the amounts varied almost 50%.[2] This was "explained" by Murphy–Adcock that the lower bill included a "trade discount" to Southeast Elevator. . . .

The dispute which gave rise to this action arose when Southeast Elevator sought to be paid for the additional work. ACG declined to pay for those services rendered by Murphy–Adcock. It also retained those monies termed "retainage" under its contract with Southeast Elevator. Subsequently, ACG filed a complaint alleging breach of contract and seeking a declaratory judgment adjudicating the rights and obligations of these parties. Murphy–Adcock responded by filing a complaint against ACG and Southeast Elevator seeking recovery under various theories for the cost of the drilling work it had performed. Southeast Elevator and Murphy–Adcock filed answers to ACG's complaint and then filed counterclaims against ACG.

The counterclaim of Southeast Elevator against ACG sought recovery of the amount of the unpaid retainage, certain damages for its increased costs alleged to have been caused by ACG, and a further claim that ACG was responsible for any amounts due Murphy–Adcock.

The counter-claim filed by Murphy–Adcock sought recovery of the costs associated with the drilling of the holes.

The various actions were consolidated for trial in the chancery court. ACG voluntarily dismissed its complaint, but continued to defend the claims made against it by both Southeast Elevator and Murphy–Adcock.

2. The court used the lower figures in assessing damages. (Footnote added).

After the presentation of all the proof, the chancellor found that Southeast Elevator was entitled to recover damages from ACG in the amount of $40,255.00 in addition to retainage and two small change orders totaling $23,-324.90. The court further found that Murphy–Adcock was entitled to receive, after credits, $48,222.50 from Southeast Elevator. The court awarded pre-judgment interest which is not an issue on this appeal. The chancellor further found that Murphy–Adcock was entitled to $57,731.72 jointly from ACG and Southeast Elevator and ordered that "[t]his sum shall be paid by ACG, Inc., jointly to Southeast Elevator, Inc., and Murphy Adcock Elevator Shaft Drilling, with the balance of the judgment hereinbefore awarded to Southeast Elevator, Inc., to be paid solely to Southeast Elevator, Inc." [3]

A motion to alter or amend the judgment was filed. In response, the court ordered an alteration in the judgment previously entered involving calculations of interest resulting in a total judgment against ACG, Inc., in the amount of Sixty–Eight Thousand Eight Hundred Thirty and 26/100 Dollars. ($68,830.26). The judgment otherwise was unchanged insofar as the issues before this court are concerned.

ACG has appealed raising the following issues for our review:

1. The trial court erred in determining that ACG had materially breached the contract between itself and Southeast by violation of an implied condition of good faith.
2. Southeast and Murphy–Adcock are estopped from any claim against ACG.

We enter upon our review cognizant of our duty under Rule 13(d), Tennessee Rules of Appellate Procedure. "Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." In a *de novo* review, the parties are entitled to a reexamination of the whole matter of law and fact and this court should render the judgment warranted by the law and evidence. *Thornburg v. Chase*, 606 S.W.2d 672 (Tenn. App.1980); *American Buildings Co. v. White*, 640 S.W.2d 569 (Tenn.App.1982); Tennessee Rules of Appellate Procedure, Rule 36. We note that no such presumption attaches to conclusions of law. *See Adams v. Dean Roofing Co.*, 715 S.W.2d 341, 343 (Tenn.App.1986).

In its first issue ACG argues that the trial court erred in determining that it had materially breached its contract with Southeast Elevator by violation of an implied condition of good faith. ACG complains that the court relied upon *Kemmons Wilson, Inc., v. Allied Bank*, 836 S.W.2d 104 (Tenn.App.1992) and asserts that the court in *Kemmons* was interpreting Texas law.[4] It is true that *Kemmons* was interpreting Texas Law, however, the rule expressed and applied in *Kemmons* also prevails here.

In *Kemmons* it is said:

Although Texas courts do not recognize in every contract an implied duty of good faith and fair dealing, they do recognize that "where the obligation of a party depends upon a certain condition being performed and the fulfillment of that condition is prevented by the act of the other party, the condition is considered fulfilled." *Anderson v. Jasper Federal Savings & Loan Ass'n*, 738 S.W.2d 768, 770 (Tex.Ct. App.1987). *See also Sargent v. Highlite Broadcasting Co.*, 466 S.W.2d 866, 867 (Tex.Civ.App.1971). This is also true where the other party hinders or makes

---

3. Paragraph 25 of the contract between ACG and Southeast provides:

　25. Payments to be made jointly to Southeast Elevator and their material suppliers, and their subcontractors. These payments will be determined by ACG based on Southeast Elevator's approved schedule of values.

4. The Supreme Court of Texas has specifically rejected the theory that every contract contains an implied duty of good faith and fair dealing.

*English v. Fischer*, 660 S.W.2d 521, 522 (Tex. 1983). Texas courts will recognize such a duty only when a special relationship exists between the parties, such as the relationship between insurer and insured. *Aranda v. Insurance Co. of North America*, 748 S.W.2d 210, 212 (Tex.1988); *Texstar North America, Inc. v. Ladd Petroleum Corp.*, 809 S.W.2d 672, 677–78 (Tex.Ct.App. 1991). *See Kemmons*, supra.

impossible the fulfillment of a condition,.... *Fair v. Uhr,* 310 S.W.2d 125, 128 (Tex.Civ.App.1958); *Rich v. McMullan,* 506 S.W.2d 745, 747 (Tex.Civ.App.1974).

Our counterpart to the Texas rule is found in *The Wil–Helm Agency v. Lynn,* 618 S.W.2d 748 (Tenn.App.1981):

Each party to the contract was under an implied obligation to restrain from doing any act that would delay or prevent the other party's performance of the contract. *Fritz–Rumer–Cooke Co. v. United States,* 279 F.2d 200 (6th Cir.1960). Each party had the right to proceed free of hinderance by the other party, and if such other party interfered, hindered, or prevented the performance to such an extent as to render the performance difficult and diminish the benefits to be received, the first party could treat the contract as broken and was not bound to proceed under the added burdens. *See: Anvil Mining Co. v. Humble,* 153 U.S. 540, 14 S.Ct. 876, 38 L.Ed. 814 (1894). See also: 1 Restatement, Contracts, § 315 (1932); 4 Corlin on Contracts, § 947 (1951).

*Wil–Helm* at pages 751 and 752.

In this jurisdiction an implied duty of good faith and fair dealing is recognized in every contract in its performance and enforcement. *See e.g., TSC Indus., v. Tomlin,* 743 S.W.2d 169, 173 (Tenn.App.1987); *Williams v. Maremont Corp.,* 776 S.W.2d 78 (Tenn.App.1988); *Wallace v. National Bank of Commerce,* 1995 WL 30597, an unpublished opinion of this court by Judge Tomlin, filed January 26, 1995. What this duty consists of, however, depends upon the individual contract in each case. In construing contracts, the courts must look to the language contained in the instrument and to the intention of the parties and impose a construction which is fair and reasonable. See *Covington v. Robinson,* 723 S.W.2d 643, 645 (Tenn.App. 1986). "In *Bank of Crockett v. Cullipher,* 752 S.W.2d 84, 91–92 (Tenn.App.1988) this court held that while the contractual obligation of good faith exists, the terms of the contract must be looked to in order ascertain the standards by which good faith is to be measured." *Wallace v. Bank of Commerce,* supra.

While the contract between ACG and Southeast does not state whether the drilling will be "inside" or "outside," it is obvious that the parties contemplated "outside" drilling at the time of the execution of the subcontract. There was evidence that ACG's architect, job superintendent, and project manager knew that Southeast intended to drill "outside." Additionally, Mr. James C. Marler testified that he was in the excavating and paving business and that he had the responsibility of backfilling, digging all the footings and putting the rock on the pad. He further testified as follows:

Q. Did you ever go into the job trailer, Mr. Marler, and see a chart or graph?

A. Yes, I was in there numerous times getting Terry Lovelady, the superintendent of the job, asking him questions or using his telephone.

Q. And did you look at that chart in order to—or did you see when you looked at the chart how the drilling for the five elevator holes was scheduled?

A. Yes, sir. Best of my knowledge it was late September, first of October somewhere in there it was shaded in.

Q. Would that have been early in the project?

A. Yeah, to my—yeah, that's about when we would have—right after we started digging the footings.

Q. Do you know what outside drilling is or what the term means?

A. Yes, sir.

Q. And what do you understand that to mean?

A. That's whenever we get the building slab ready and we first start doing the footings, they bring in outside—we call them well drilling rigs, and they drill the elevator shafts.

Q. And based upon your observation of this graph or chart, Southeast Elevator was scheduled to do outside drilling then?

A. Yes, sir.

\*   \*   \*   \*   \*   \*

Q. Now, with reference to that job chart, Mr. Marler, do you recall how that drilling was scheduled?

A. Yes. I remember just briefly looking over it at one time right when we first started the job ... It [the chart] had on there—I believe it was the late end of September, first of October, it said, "SE Elevator outside drilling."

Q. Had the words "outside drilling" on it?

A. Yes, sir.

\* \* \* \* \* \*

ACG's architect, Mr. Alan Derthick testified that the most common method of drilling elevator holes on a new construction that's beginning from a clear site (as was the case here) was outside drilling. He further stated that the outside drilling could have been accomplished more quickly.

The chancellor found:

[T]he evidence was rather overwhelming that the only sensible way of doing the drilling work on this job was by outside drilling. Thus, such was clearly implied and was a condition of the subcontract to be performed by Southeast Elevator. If, due to his inexperience, Mr. Lovelady did have inside drilling in mind, such is immaterial as to the terms of the contract.[5] Thus, ACG materially breached its contract by failing to give five (5) days notice to Southeast to commence its work on the job site.[6] ACG is, therefore, not entitled to indemnity or attorney's fees.

Southeast did not rely upon the breach by ACG to discontinue performance on their subcontract, nor did it loudly insist at that time upon payment of damages. For some reason, there appears to have been little said about the substantial change in Southeast's work. Perhaps Southeast was initially willing to suffer some loss to have the prestige of doing this job. Its November 13, 1989 letter is to the effect that it would go ahead and perform and seek to mitigate its damages.

It is a well established rule in Tennessee that the party injured by the wrongful act of another has a legal duty to exercise reasonable and ordinary care under these circumstances to prevent and diminish the damages. One is not required, however, to make extraordinary efforts. *Arkansas River Packet Co. v. Hobbs,* 105 Tenn. 29, 58 S.W. 278 (1900).

The burden of showing that losses could have been avoided by the plaintiff by a reasonable effort to mitigate damages after defendant's breach of contract is on the defendant who breached the contract. *United States for Use of E.R. [E & R] Const. Co., Inc. v. Guy James Const. Co.,* 390 F.Supp. 1193, affirmed 489 F.2d 756 (1972).

It appears to the Court that Southeast attempted to perform the drilling itself to minimize extra costs. However, upon the urging of ACG to speed up, and then with the knowledge of ACG's Vice President of Murphy–Adcock rates and their capabilities, Southeast was clearly directed to bring Murphy–Adcock on the job to finish the drilling.

There is no question but that Southeast Elevator is liable to Murphy–Adcock for its reasonable charges. And, to the extent such increased its costs, such are legitimate and reasonable elements of damage caused by the breach of contract by ACG. Also, under the proof presented, the Court is of the opinion that ACG promised to guaranty or insure that Murphy–Adcock got paid for its work.

We agree with the conclusions of the chancellor on this issue. Accordingly we find no merit in the appellant's contention. We further note that the failure of ACG to give the

---

5. Mr. Lovelady was the on-site superintendent for ACG. He stated that he assumed the drilling was to be "inside" because all of his experience had been with "inside" drilling. (Footnote added).

6. Paragraph 6 of the contract between ACG, Inc., and Southeast Elevator provides in pertinent part that:

6. Subcontractor shall begin the performance of this subcontract within five (5) days after notice by Contractor and substantially complete the subcontract in accordance with Contractor's schedule.... (Footnote added).

notice required by the express terms of the contract, paragraph 6, (see footnote 6), is consistent with a finding of breach of contract by ACG.

Lastly, ACG argues that Southeast Elevator and Murphy–Adcock are barred from making a claim against ACG because the acts of Southeast and Murphy–Adcock imply a waiver or estoppel and bars them from making any claims for breach of contract against ACG.

The elements of implied waiver are identical to the elements of equitable estoppel. *Chattem, Inc. v. Provident Life & Accident Ins. Co.,* 676 S.W.2d 953 (Tenn.1984). The essential elements of equitable estoppel are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party who is estopped; and (3) action based thereon of such a character as to change one's position prejudicially. *Id.* at 955.

Estoppel is not favored and it is the burden of the party seeking to invoke the doctrine to prove each and every element thereof. *Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc.,* 936 F.2d 889, 895 (6th Cir.1991); *Bokor v. Holder,* 722 S.W.2d 676, 680 (Tenn.App.1986). *See also St. Francis Hospital, Inc. v. Lagonia,* 1993 WL 44585, an opinion of this court by Judge Tomlin, filed February 23, 1993.

The record simply does not support a finding of implied waiver or equitable estoppel. Further, however, waiver and estoppel are affirmative defenses that must be pled with specificity. Rule 8.03, Tennessee Rules of Civil Procedure states:

> 8.03 **Affirmative Defenses.**—In pleading to a preceding pleading, a party shall set forth affirmatively facts in short and plain terms relied upon to constitute ... estoppel, ... waiver, and any other matter constituting an avoidance or affirmative defense. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court, if justice so requires, shall treat the pleading as if there had been a proper designation. [As amended by order adopted January 28, 1993, effective July 1, 1993.]

In its answer to the counter-claim of Southeast, ACG states as an affirmative defense the following:

### SECOND AFFIRMATIVE DEFENSE

Southeast Elevator's claims are subject to the doctrine of estoppel, inasmuch as Southeast Elevator has failed to comply with the provisions of the subcontract between Southeast Elevator and ACG with respect to timely requests for modifications to the contract sum as contained in Section 8 of said subcontract as well as in other provisions of the subcontract.

In addition to the failure of the appellant to establish waiver or estoppel by a preponderance of the evidence, we are of the opinion that the conclusory allegations set out above are insufficient to meet the requirements of Rule 8.03, Tennessee Rules of Civil Procedure, therefore, rendering the defense procedurally defective. Had the evidence preponderated otherwise, we may have been less inclined to notice this procedural deficiency absent a motion for a more definite statement. Rule 12.05 Tennessee Rules of Civil Procedure.

We affirm the judgment of the trial court in all respects. Costs are taxed to the appellant and this case is remanded to the trial court for the collection thereof.

FRANKS, J., and CLIFFORD E. SANDERS, Senior Judge, concur.