IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 8, 2003 Session

## PORTLAND UTILITIES CONSTRUCTION COMPANY, LLC v. CHASE CREEK, LLC ET AL.

### Appeal from the Chancery Court for Davidson County
### No. 99-2471-I     Irvin H. Kilcrease, Jr., Chancellor

---

### No. M2002-02886-COA-R3-CV - Filed April 7, 2004

---

A utilities contractor sued a subdivision developer for payment for work it performed on the subdivision's infrastructure. The court found that the developer was obligated to honor its contract by paying for work with a value of $313,829. The court also found that the developer was entitled to an offset of $55,955 for damages resulting from defects in the contractor's performance. The developer argues on appeal that the trial court erroneously declined to grant it additional offsets. We affirm the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
### Affirmed and Remanded

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

T. Turner Snodgrass, Nashville, Tennessee, for the appellants, Chase Creek, LLC and Travelers Casualty and Surety Company of America.

Joe A. Conner, Sheri A. Fox, Chattanooga, Tennessee, for the appellee, Portland Utilities Construction Company, LLC.

### OPINION

### I. A CONSTRUCTION CONTRACT

This case arose from a contract executed on May 14, 1997, between owner-developer Chase Creek, L.L.C., ("the developer") and Portland Utilities Construction Company, L.L.C. ("the contractor"). The developer planned to build a residential subdivision on 43 lots that were partly within Davidson County and partly within Williamson County.

The terms of the contract obligated Portland to remove two barns from the property, to remove a pond by filling it with compacted onsite materials, and to install storm drains, water lines, sewer lines, and electrical conduit. Grading of the roads was also included in the contract, but paving was to be done by another contractor. Grading and preparation of the lots themselves were also to be done by other contractors. The contract at issue did not identify a general contractor for the project, but the evidence suggests that the developer and its agent Patrick Malone performed that function.

Although the contract included a lump-sum price for "site preparation," the parties refer to it as a unit price contract. Items such as excavation of solid rock and backfilling were to be charged on the basis of the quantities required, because there was no way to determine in advance exactly how many cubic yards of solid rock would have to be removed or how many tons of crushed stone would be needed for backfilling. Payment was to be made biweekly as work was completed. The contract did not contain a liquidated damages provision or a guaranteed completion date.

The plans for the project were approved by the State of Tennessee in July of 1997, and work began shortly thereafter. It did not take long for problems to arise. The contractor initially made Kepley & Sons its subcontractor for excavation, road grading, and pond compaction.[1] After the first week, Kepley's crew only worked on the project sporadically, and in November of 1997, Chase Creek requested that the subcontractor be removed for absenteeism and for overstating the quantity of rock it had excavated. Portland agreed, and decided to complete the work with its own employees.

Unfortunately, new problems arose. According to Chase Creek, most of those problems resulted from the contractor's failure to do the work correctly the first time, leading to delays and to additional expenses for repairing or redoing defective work. Portland denied that it was at fault, and pointed instead to a number of other factors, including alleged errors by surveyors, engineers, and other contractors. The proof showed that construction of houses on individual lots began as early as April of 1998 and continued during the infrastructure work. Portland claimed that the combined effects of unusually wet weather and heavy construction traffic on graded but unpaved roads caused massive erosion, forcing it to regrade the same roads three or four times.

The infrastructure work took far longer than the developer thought reasonable, and far more solid rock had to be removed than was anticipated. Although the owner of Portland Utilities testified that storm sewers, water lines and storm drains were "pretty well finished" by June 1998, additional road work was still needed and electrical conduit still had to be installed. Portland continued to work on the site until May of 1999. Final approval of its work was subsequently obtained, but Chase Creek stopped making payments to Portland after August 1998.

---

[1] Ernest Woodcock, Portland's principal owner, testified that Kenny Kepley originally intended to bid on the Chase Creek contract, but could not procure a required bond. Kepley contacted Portland and asked that company to furnish the bond and to act as the general utilities contractor, with Kepley doing the actual work. The proof shows that the developer was fully aware of this arrangement.

The contractor submitted a final bill to the developer for a remaining balance of over $300,000. Chase Creek declined to make any payment. On May 20, 1999, the contractor sent a notice of non-payment to the developer. On June 10, 1999, notices of mechanics and materialmen's liens were filed with the Register of Deeds of both Davidson and Williamson County.

## II. COURT PROCEEDINGS

On August 30, 1999, Portland Utilities filed a Complaint in the Chancery Court of Davidson County asking the court to order Chase Creek to pay it the balance which it was entitled to for materials it provided and work it completed for the developer.[2] Travelers Casualty and Surety Company of America was later added as a defendant pursuant to Tenn. Code Ann. § 66-11-142.

Chase Creek filed an Answer on October 5. The developer alleged that the contractor's claims were based upon materials which were not incorporated into the project or not documented, included work that was necessary only to correct the contractor's own mistakes, and included work which was of no benefit to the project. Chase Creek also counter-complained for additional expenses it incurred in finishing or correcting Portland's work, as well as for lost profits and interest expense allegedly arising from the contractor's delays.

The hearing of the matter began on May 6, 2002, and took three days in all. Ernest Woodcock, owner of Portland Utilities, was the primary witness for the plaintiff. His testimony was consistent with that of five of his supervisors who worked on the project as to the necessity to repeat certain work because of errors in the plans and damage caused by other contractors.

The defendant's chief witness was Patrick Malone, a homebuilder and former real estate agent who supervised the project for Chase Creek, and was one of the developer's three owners. Mr. Malone recited a long litany of grievances against Portland and of the costs he incurred as a result of delays in the completion of those parts of the project that were Portland's responsibility. On cross-examination, he reluctantly acknowledged that errors and delays by other contractors may have contributed to the difficulties Portland experienced.

For example, Mr. Malone admitted that the plans given to Portland showed a road width of 29 feet. As we noted above, the contractor had to grade the same roads more than once because of damage caused by a combination of heavy rains and construction traffic. After Portland finished what it hoped would be a final grading, the paving contractor told the utilities contractor that his machinery required a road width of 31 feet in order to properly install curbs and paving. As a result, Portland had to do the grading yet again.

Mr. Malone also admitted that his electrical contractor neglected to furnish Portland with the specifications for installation of electrical conduit until after the conduit had been installed in the

---

[2]Portland filed a similar Complaint in the Chancery Court of Williamson County. It was consolidated with this one by Agreed Order.

same trenches with the lateral sewer lines, and the trenches had been filled in. After Portland was informed that NES required a vertical displacement of at least 18 inches between the conduit and the sewer lines, Portland had to dig up and deepen the utility trenches.

Another area of contention was the amount of crushed stone used in the project as backfill. The contractor had originally estimated that 8,000 tons (at $13.29 per ton) would be enough. The actual amount billed for and proven to have been used was over 17,000 tons. Mr. Woodcock testified that because of the depth of the trenches, OSHA regulations required that trench boxes be used. Wider trenches had to be dug in order to install the trench boxes, and since the trenches were under the roadway, engineering requirements dictated the use of stone to fill in the entire trench.

The defendant called Bernie Auld, a civil engineer, to testify as an expert witness on a number of matters, including the amount of crushed stone the contractor should have used. Mr. Auld testified that "Metro Specifications" for calculating the amount of crushed stone necessary to be used as backfill for installation of storm sewers, water lines and sanitary sewers resulted in a figure of 11,636 tons. Under cross-examination, he admitted he had made an error on storm sewer calculations of up to 3,000 tons, and that his calculation included no consideration of lateral lines running off the main sewer line or of the extra depth required for electrical conduit. He also acknowledged that he was not familiar with the actual conditions present in the project under review.

At the conclusion of the proof, the chancellor declined to hear closing arguments and announced that he wanted both parties to submit proposed findings of fact and conclusions of law for his consideration. In those detailed submissions, the developer contended that it was entitled to an offset of over $245,000 against Portland's claim, while Portland contended that the developer was entitled at most to offsets of $55,955. In orders dated October 9 and October 23, 2002, the court adopted Portland's analysis.

The court found that Portland had completed its contract in an amount of time that was reasonable under the circumstances and that the delays the developer complained of were due to the heavy rains, the errors of surveyors and engineers, and the activities of other contractors. The court also found that Portland was entitled to be paid for all the crushed stone that it used for backfill, because conditions at the work site and OSHA regulations required the use of far more stone than was anticipated.

The court did award the developer three offsets, amounting to $55,955, to be applied against the $313,829 contract price. These included $23,395 to compensate it for extra site work required on the lot where the pond had been, because Kepley & Sons had used construction debris to fill the pond instead of engineered fill; $20,160 for cleanup work the developer had to do around the site of the contractor's excavations; and $12,400 for completion of one cul-de-sac that was improperly graded by Portland. Chase Creek appealed.

### III. ISSUES ON APPEAL

Since the chancellor has adopted the findings of fact submitted by Portland, they have explicitly become the findings of the court. Findings of fact by a trial court are entitled to a presumption of correctness on appeal, unless the evidence preponderates otherwise. Rule 13(d) Tenn. R. App. P.

Chase Creek argues that it was entitled to have the judgment against it offset by four additional claims that were either disallowed or not specifically addressed by the trial court. These items are (1) the costs it incurred to reimburse the paving contractor for pug mix which allegedly was Portland's responsibility to furnish, (2) costs of $45,660 which Chase Creek paid to other contractors, allegedly for the purpose of correcting or finishing construction work which was Portland's obligation under the contract, (3) costs which were billed by Portland as "extra work," but which Chase Creek alleged was actually required under the contract, and (4) damages for delay because, contrary to the trial court's findings, the project was not completed in "a reasonable time." We will examine each of these claims in turn.

### A. THE PUG MIX

The witnesses testified that the normal sequence of steps for paving a road is first to grade the earth to the proper slope, then to pour concrete curbs on either side of the road to prevent the graded earth from being washed or eroded away. After the curbs are done, a layer of gravel or crushed stone (which is referred to as pug mix) is added and leveled to the correct tolerances. In the event of heavy rains before a final layer of asphalt is laid on top of the pug mix, there is also some danger of the mix being washed away. Thus, prompt follow-up by the paving contractor is necessary to preserve the work that has already been done on the road.

The proof shows that after Chase Creek experienced some difficulty in finding a contractor to lay the pug mix, Portland agreed to do the work. When the paving contractor prepared to begin his portion of the work, he found that there were low spots on the road, and he added $7,094 worth of pug mix to completely bring the roads up to subgrade. The developer contends that the trial court should have granted it an offset for this amount.

Mr. Woodcock testified that the roads were ready to be curbed and paved by November of 1998. But the paving contractor was not ready to begin work until March of 1999. Mr. Malone faulted Portland for failing to take some unspecified preventive measures to keep the pug mix from eroding in the intervening months.

Chase Creek's own witness, excavating contractor Michael Bowers, testified that in the absence of curbs, rain and construction traffic will cause a layer of pug mix to erode. In light of the winter rains, the hilly topography of the site, and the continuing traffic on the incomplete roads, it is unclear whether any kind of preventive measure would have prevented the erosion that occurred.

Thus, we do not believe the evidence preponderates against the trial court's finding that Chase Creek was not entitled to an offset for the additional expense.

## B. CORRECTIONS TO PORTLAND'S WORK

The appellant claimed that the trial court erred by failing to award it an offset for $20,500 that it paid Wilson Construction and $25,160 that it paid Mike Bowers to widen and backfill the roads, slope the banks, and remove rock and debris from the site.

The primary problem with these claims is a failure of proof on the part of Chase Creek. While the plaintiff must carry the burden of proof on its own claims, the burden shifts to the defendant to establish any of the counterclaims it asserts. *Heyer-Jordan & Associates, Inc. v. Jordan*, 801 S.W.2d 814, 822 (Tenn. Ct. App. 1990), *Nelson v. Richardson,* 626 S.W.2d 702, 706 (Tenn. Ct. App. 1981).

We note that Patrick Malone testified without elaboration that Chase Creek's payment to Albert Wilson was for work that Portland was obligated to do under its contract. He relies on an undated work order from Wilson Construction, which describes the work as, "site work backfill roadwork backhoe slope banks cleanup $13,000/$7,500 rock and dirt removed on lots."

While Portland's contract did include backfill and roadwork, it did not include work on the lots themselves. Further, Mr. Malone's own testimony shows that he instructed Portland to place excavated site materials on many of the lots in the subdivision, and that the site was a mess in part because of the activities of the homebuilders. Mr. Wilson was not called upon to testify, so we have no way of knowing how much of his work (if any) should actually have been covered by Portland's contract.

Turning to the claim based on the work performed by Mike Bowers, the record contains six statements by the excavating contractor for work he did between March 3 and August 26, 1999. The total billed amounts to exactly $25,160. Portland argues that it can only be responsible for work done up to the end of May 1999, for by that date all the road and utility work had been accepted by the Metropolitan Government, and Portland had completed its contract.

We note that the four statements dated prior to June 1999 are for a total of $20,160. The trial court's order states under the category of Site Work - Cleanup, "[t]he Court finds, over Portland Utilities' objection, that Chase Creek is entitled to credit against the amount due to Portland Utilities for the excavation claims in the amount of $20,160." It thus appears that Chase Creek is asking this court to give it a second award for the same damages that it already has been allowed to recover.[3]

---

[3]Mr. Bowers was also the contractor who completed the cul-de-sac for which the court awarded Chase Creek a setoff of $12,400.

The statements on the $5,000 excluded by the court's order simply recite hourly charges for equipment used by Mr. Bowers, including a dump truck, bulldozer and backhoe, with no indication other than the phrase "Site Work" as to exactly what work was performed. While we are not convinced that Portland is immunized against claims for work performed by other contractors after the end of May 1999, Chase Creek has presented no proof that the statements are for work that Portland's contract obligated it to do. In light of uncontradicted testimony that the activities of other contractors resulted in debris and damage to the site, we do not believe that Chase Creek carried its burden of proof, or that the evidence preponderates against the trial court's decision not to award additional reimbursement to the developer for its payments to Mr. Wilson and Mr. Bowers.

## C. EXTRA WORK

The appellant claimed that the trial court erred in awarding Portland $17,803 for work the developer insisted was included in its original contract, but which the contractor claimed was a later addition. This included seeding and mulching alongside curbs, raising fire hydrants, locating and raising meter boxes and manhole covers, and work on catch basins.

Mr. Malone admitted that seeding and mulching were not mentioned in the original contract, but stated that they were included in the plans given to the contractor, and that "I just took it for granted they were going to do it." Chase Creek argues without citing to any evidence or authority that such items "are work normally performed by a contractor or are required by the plans or specifications." We do not believe this is sufficient to prove that seeding and mulching were within the scope of the contract between Chase Creek and Portland Utilities.

Installation of fire hydrants, meter boxes, manhole covers and catch basins, on the other hand, is explicitly mentioned in the contract. But the record shows that after Portland initially installed these items, the trucks of contractors and suppliers damaged many of them numerous times, forcing Portland to repair or replace them without receiving additional reimbursement. Further, staking errors by the surveyor compelled Portland to dig up and move even undamaged catch basins. The contract made staking the responsibility of the owner. Since there would not have been a need for final changes to these items if it were not for the actions of other contractors and/or the developer, we do not believe the evidence preponderates against the trial court's finding that such adjustments were "extra" and that Portland was entitled to reimbursement.

## D. DELAY DAMAGES

When a contract does not include a specific completion date, it is implied that the obligor is duty-bound to complete its performance within a reasonable time. *Minor v. Minor,* 863 S.W.2d 51 (Tenn. Ct. App. 1993). "What constitutes a reasonable time within which an act is to be performed where a contract is silent upon the subject depends on the subject matter of the contract, the situation of the parties, their intention in what they contemplated at the time the contract was made, and the circumstances attending the performance." *Minor*, 863 S.W.2d at 54 (quoting 17A Am.Jur.2d

Contracts § 480 (1991)). The trial court in this case specifically found that Portland completed its work within a reasonable time.

Because of the complex nature of large construction projects, it is not uncommon for the work of a contractor to be delayed due to the action of other contractors on the same project. *See ACG, Inc. v. Southeast Elevator, Inc.*, 912 S.W.2d 163 (Tenn. Ct. App. 1995); *Airline Construction, Inc. v. Barr,* 807 S.W.2d 247 (Tenn. Ct. App. 1990); *Moore Const. Co., Inc. v. Clarksville Dept. of Electricity,* 707 S.W.2d 1 (Tenn. Ct. App. 1985); *V. L. Nicholson Co. v. Transcon Inv. and Financial Ltd., Inc.,* 595 S.W.2d 474 (Tenn. 1980). Even when there is a clause in the contract providing for liquidated damages in the event of delay, such damages will not be awarded to a party whose actions contributed to the delay. 807 S.W.2d at 262, 595 S.W.2d at 484

The trial court's final order contained detailed findings on the cause of the delays in Portland's performance. These included abnormally wet weather conditions from December 1997 through May 1998, the unexpectedly large quantity of rock that had to be excavated, and damage caused by delivery trucks, home contractors and other traffic. All of these findings are supported by evidence in the record, including testimony by the developer's own witnesses. It appears to us that the evidence does not preponderate against the trial court's finding that Portland completed its work within an amount of time that was reasonable under the circumstances.

But even if we found that Portland did not complete its work in a reasonable time, it would still be up to Chase Creek to prove that it had been damaged by the delay, and to prove the extent of its alleged damages. The trial court found that the developer failed to prove its damages. We agree.

The developer argues that it is entitled to an offset of $65,661 for all loan interest payments it made after July 1998, because ". . . had Portland merely completed the roads within ten months and maintained an organized construction site, it is submitted that Chase Creek could have generated sufficient sale proceeds to fully pay its loan in June, 1998."[4]

Chase Creek claims that the poor condition of the roads deterred prospective property buyers from purchasing its lots, thus preventing the developer from paying off its construction loan as quickly as it otherwise would have been able to. It is unclear how the developer could have proved how many more lots it would have sold if not for the condition of the roads. In any case, the proof showed that lot sales did occur during the period that the roads remained unfinished, with three sales in 1997 after the signing of the contract, and eleven sales in 1998.

---

[4]Chase Creek did not inform Portland that it intended to hold the contractor liable for interest payments on its construction loans until after Portland filed its complaint. In another case involving retainage of funds and construction delays, this court held that the damages the plaintiff contractor was entitled to collect did not include interest it could have earned on unpaid contract funds, because the accrual of such interest was considered to be a special damage that was not within the contemplation of the parties. *Moore Construction v. Clarksville Department of Electricity,* 707 S.W.2d 1, 15 (Tenn. Ct. App 1985). Although the details of this case are somewhat different, we believe the same analysis would apply.

The developer argues that "[b]ecause of site conditions, no sales were made between November 20, 1998 and March 12, 1999 other than one sale to a member of the Chase Creek Development entity." This period corresponds to the interval between Portland laying down the pug mix and the paving contractor finishing the roads. However, as we indicated above, damage to the graded roadway by construction traffic and the paving contractor's own lack of promptness were significant factors in the delay of road completion. Thus, if the developer suffered any damages as a result of this delay, they cannot be attributed to Portland's actions alone.

## IV. CONCLUSION

Upon examination of the record, it appears to us that progress on the subdivision was impeded by lack of coordination between the activities of various contractors who worked on different parts of the same project at the same time, difficulties which were exacerbated by unusually wet weather. The developer has chosen to attribute all its damages to only one of those contractors, despite proof showing that many others (including itself) were also at fault.

The trial court agreed with the developer that the utilities contractor had to bear responsibility for the extra expenses the developer incurred as a result of the contractor's errors, and reduced the amount it was entitled to collect on its contract by the amount of such expenses. The developer argued on appeal that the trial court erred in declining to award it additional offsets against the utilities contractor. We do not agree, because the developer has failed to prove that the contractor was responsible for those additional damages.

The judgment of the trial court is affirmed. We remand this case to the Chancery Court of Davidson County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellant, Chase Creek, L.L.C.

_____
PATRICIA J. COTTRELL, JUDGE