IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 28, 2006 Session

# HARPER-WITTBRODT AUTOMOTIVE GROUP, LLC, v. SAM TEAGUE, ET AL.

Appeal from the Chancery Court for Dickson County
No. 7010-01     Robert E. Burch, Chancellor

No. M2005-00203-COA-R3-CV - Filed on September 20, 2006

This is an appeal from the granting of specific performance pursuant to an option to purchase contained in a lease agreement between Sam Teague and Sam Teague Chrysler, Inc., and the predecessor in interest of Harper-Wittbrodt Automotive Group, LLC.  Each of the parties have made numerous assignments of error with respect to the ruling of the trial court and the relief granted by it.  After consideration of each of the issues raised by the parties, we affirm, in all respects, the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

DONALD P. HARRIS, SR.J., delivered the opinion of the court, in which ALAN E. HIGHERS and DAVID R. FARMER, JJ, joined.

Charles Patrick Flynn, Michael K. Radford, Brentwood, Tennessee, for Appellants, Sam Teague and Sam Teague Chrysler, Inc.

Benjamin C. Regen, Dickson, Tennessee, for Appellee, Harper-Wittbrodt Automotive Group, LLC.

**OPINION**

This is the second time this case has been appealed to this Court.  Sam Teague (Teague)[1] previously worked for Chrysler Corporation in a managerial role.  When he left Chrysler in 1978, he engaged in the business of buying failing businesses, turning them around and selling them for a profit.  In 1989, Teague purchased a Chrysler dealership in Dickson, Tennessee, which he renamed Sam Teague Chrysler.  In late 1995, Betty L. Harper and her business associate, Ralph O'Conner, engaged a business broker, desiring to purchase an automobile dealership in the Nashville area.  In October 1995, they visited Sam Teague Chrysler. Following that visit, O'Connor-Harper Investments, Ltd., the predecessor in interest to Harper-Wittbrodt Automotive Group, LLC, (Harper-Wittbrodt), forwarded to Teague a letter expressing an interest in acquiring the dealership.  The

---

[1]Appellants, Sam Teague and Sam Teague Chrysler, Inc., will be referred to singularly as "Teague."

parties negotiated a deal whereby O'Connor-Harper Investments, Ltd., would purchase the dealership and lease the real property on which it was situated. During the course of the negotiations, O'Connor-Harper expressed a desire to ultimately purchase the real property outright.

The parties entered into a five year lease beginning January 2, 1996, and ending on January 2, 2001. In 1998, Betty Harper and her son formed Harper-Wittbrodt and bought the dealership from O'Connor-Harper. O'Connor-Harper assigned the lease to Harper-Wittbrodt in December 1998, with the consent of Teague.

Paragraph 31 of the lease agreement contained an option to purchase the property at the end of the lease period, providing:

> Sixty (60) months following the execution date of this Agreement, Tenant shall have the right and option to purchase the premises, by giving written notice to Landlord of Tenant's intent to do so no later than ninety (90) days prior to the expiration of the initial term or any renewal term. The purchase price for the premises if the option is exercised shall be the then fair market value of the premises payable in cash at closing. No rent shall be applied to the purchase price. Rent shall be prorated to date of closing, if applicable. Closing shall be held at a place in Dickson County, Tennessee, designated by Landlord, with any attorney's fee for such closing to be split between the parties. Landlord shall provide a good and valid Warranty Deed at closing. All other closing costs shall be paid by Tenant. Tenant may, at its option, pay all or any portion of the outstanding and unpaid principal and interest due by Landlord to the Underhills pursuant to the promissory note dated August 5, 1994 in the original amount of $ 500,000.00 by and between Landlord as maker and the Underhills as payee, including any extensions or renewals thereof (the "Underhill Note"). Any payments made by Tenant on the Underhill Note shall be credited against and reduce the next occurring lease payments due to Sam Teague Chrysler, Inc. set forth in paragraph 30(i) hereinabove and no further lease payments shall be due or payable to the Underhills as provided in paragraph 30(ii) hereinabove if the Underhill Note has been paid in full by Tenant. Landlord agrees that it shall not pledge, mortgage or otherwise encumber the premises during the term of this lease, including any renewals or extensions thereof, other than the encumbrance represented by the Underhill Note. If the parties cannot agree upon the fair market value, each shall obtain an appraisal from a duly certified appraiser, but such appraisals shall be based solely upon a comparable sales valuation approach and/or cost approach, and the income approach to valuation shall expressly not apply. The two appraisal amounts thus obtained shall be averaged to obtain a single amount, which shall be the purchase price unless either party declines to accept same within fifteen (15) days after receiving complete written copies of the appraisal reports. If either party declines to accept the price thus computed, he shall promptly notify the other party in writing and secure the services of a third appraiser. The value obtained by the third appraiser shall be averaged with the value of the other appraisal closest to the third appraisal and the amount so determined shall be the purchase price. In all events all appraisers shall be independent parties having no direct or indirect financial interest in either party or any affiliated entity and neither indebted to nor employed by either party or any other party affiliated with these parties. Any purchase price

determined by appraisal or otherwise shall be reduced in amount by the fair market value of any and all leasehold improvements made to the premises by Tenant.

The lease also contained a integration clause and required that any modification must be in writing and signed by both parties.

The facts which led to the filing of this lawsuit were set forth in the earlier opinion of this court as follows:

> On September 25, 2000, Harper-Wittbrodt notified Teague of its intent to purchase the property and offered a purchase price $ 1,124,941.11 This amount reflects an average of two (2) appraisals obtained by Harper-Wittbrodt ($ 1,550,000 and $ 1,510,000), less $ 405,058.89 which Harper-Wittbrodt contends is the value of leasehold improvements. Teague rejected Harper-Wittbrodt's appraisals on October 12, and on October 17 requested documentation regarding the leasehold improvements. On November 14, Harper-Wittbrodt sent Teague basic information regarding the improvements. Teague requested more detailed information and, in December, Harper-Wittbrodt delivered additional documentation. Teague submits that this information was insufficient to determine the fair market value of the improvements. Throughout the month of December, Harper-Wittbrodt emphasized that it intended to purchase the property no later than January 2, 2001. Teague began contacting appraisers in November of 2000, but was unable to obtain appraisals of the property until April and May of 2001. These appraisals were for $ 1,950,000 and $ 1,800,000. Additionally, Teague's appraiser disagreed with the valuation of the leasehold improvements submitted by Harper-Wittbrodt, and stated that they were difficult to analyze because they seemed to include maintenance items and items of personal benefit that would not enhance the value of the property.
>
> On January 2, 2001, Harper-Wittbrodt tendered $ 1,124,941.11 at a "closing" which Teague did not attend. On January 3, 2001, Harper-Wittbrodt filed a complaint against Teague to enforce the option to purchase. Harper-Wittbrodt moved for summary judgment on March 3, which the trial court awarded on June 28.

*Harper-Wittbrodt Auto. Group, LLC v. Teague*, No. M2001-02812-COA-R3-CV, 2002 Tenn. App. LEXIS 796, at *5-6 (Tenn. Ct. App. Nov. 6, 2002).

After obtaining summary judgment, Harper Wittbrodt stopped paying rent to Teague. Pursuant to the grant of summary judgment, the trial court ordered specific performance of the option under the following terms: Teague was to convey the property to Harper-Wittbrodt no later than forty-five days after the entry of the order by delivering a warranty deed to the property. The purchase price was to be $1,124,941.11, reduced by certain amounts. *Id.* at 7-8. After Teague's motion to alter or amend the judgment was denied by the trial court, he appealed.

On appeal, this court addressed the propriety of the trial court's grant of summary judgment to Harper-Wittbrodt. First, when examining the trial court's establishment of a closing date for conveying the property, this court stated: "After reviewing the contract in its entirety, we find that the agreement did not establish a specific closing date." *Id*. at \*11. Accordingly, this court held as follows: "[W]e believe the agreement evidenced an intent to close within a reasonable period in anticipation of a potentially protracted valuation process. The determination of what would constitute a reasonable period in light of the circumstances is a matter to be determined by a finder of fact." *Id*. at \*13. Turning to the trial court's valuation of the property, this court found that "neither party followed the agreed upon procedures." *Id*. at \*14. The court rejected Harper-Wittbrodt's argument that any appraisals obtained by Teague after January 2 were inadmissible, instead finding that "whether Teague acted unreasonably [in obtaining appraisals] under the circumstances is a matter for the trier of fact. *Id*. Finally, the court found the purchase price of the property would be the value of the property less the value of the leasehold improvements made by Harper-Wittbrodt. "This is not necessarily the cost of the improvements to Harper-Wittbrodt at the time the specific improvements were made. An issue of fact remains regarding the value of these improvements, without which the final purchase price cannot be ascertained." *Id.* at 16. This court reversed the trial court's award of summary judgment.

On remand, Teague filed a motion seeking possession of the premises and asking the trial court to require Harper-Wittbrodt to pay rent and to post security for any judgment that might be awarded Teague for back rent. The trial court permitted Harper-Wittbrodt to remain in possession of the premises but ordered it to began paying rent to Teague. The trial court reserved its ruling on the issue of back rental payments owed and indicated any such amounts would be included as an adjustment of the purchase price.

On January 29, 2004, Teague amended his answer and filed a counterclaim denying the allegations in Harper-Wittbrodt's complaint, reaffirming his previously asserted affirmative defenses, and seeking a declaratory judgment as to his obligation to perform under the option provision of the lease due to Harper-Wittbrodt's breach of the lease agreement. On July 9, 2004, Teague filed a motion to dismiss Harper-Wittbrodt's complaint alleging it failed to state a claim for which relief could be granted. In the alternative, Teague moved for summary judgment as to whether Harper-Wittbrodt had breached the lease and option agreement and was not therefore entitled to relief. Specifically, Teague alleged Harper-Wittbrodt had not made a reasonable effort to close the sale within a reasonable time after January 2, 2001, and was, therefore, in breach of the agreement. By Memorandum Opinion on Motion for Summary Judgment filed September 21, 2004, the trial court denied both Teague's motion to dismiss and his motion for summary judgment. In its memorandum, the trial court noted that a sale of the property pursuant to the option agreement required agreement of the parties as to the terms of the sale including the purchase price. The trial court noted that without such agreement, no closing was possible, and that court intervention would be required to accomplish a closing if the court determined there should be a closing.

-4-

A trial was conducted on September 27-28, 2004. After considering the evidence presented, the trial court ruled that Paragraph 31 of the lease agreement did not contemplate a situation where both parties rejected the average of the first two appraisals with both parties obtaining a subsequent appraisal. The trial court determined that by each side obtaining two appraisals, the parties had by their conduct modified the terms of the agreement and the appropriate resolution would be to set the purchase price at the average of the average of Harper-Wittbrodt's two appraisals and the average of Teagues two appraisals or, in effect, the average of all four appraisals. Accordingly, the purchase price was determined to be $1,702,500. The fair market value of the leasehold improvements made by Harper-Wittbrodt was determined to be $480,000. The trial court further determined the reasonable closing date for sale of the property was July 5, 2003, and fashioned other remedies as if the closing had taken place on that date. Teague was awarded back rent from January 2001 through July 5, 2003, in the amount of $240,175.80 and Harper-Wittbrodt was given credit against the purchase price for any rental payments made by it after that date. Teague was awarded interest on the purchase price at the rate of six percent from July 5, 2003, through the closing. Neither party was awarded damages for breach or their attorneys' fees.

The Judgment was filed in the trial court on November 11, 2004. Teague filed a Notice of Appeal to this court on December 1, 2004. On December 7, 2004, Harper-Wittbrodt filed a Motion to Alter or Amend. On February 16, 2005, this court entered an order holding that the trial court retained jurisdiction to entertain the Motion to Alter or Amend. The trial court entered an order on April 1, 2005, granting the motion by giving Harper-Wittbrodt credit against Teague's judgment for back rent for any amounts paid Teague in rent between January 2, 2001 and July 5, 2003, and credit against the purchase price for all sums paid to Teague by or on Harper-Wittbrodt's behalf from July 5, 2003, until the date of closing.

On this appeal, Teague alleges:

1. the trial court erred when it failed to grant Teague's motion to dismiss the complaint for failure to state a claim upon which relief could be granted;

2. the trial court erred in awarding Harper-Wittbrodt specific performance of the option provision of the lease;

3. the trial court erred when it failed to find that Teague's duty to perform under the contract was discharged by virtue of Harper-Wittbrodt's breach of the contract; and,

4. if Teague was not discharged from performing under the contract, the trial court erred in failing to enforce the contract as written.

On this appeal, Harper-Wittbrodt alleges:

-5-

1.  the trial court erred when it failed to recognize the fair market value of the property as the appropriate purchase price;

2.  the trial court erred when it determined the reasonable date of closing for the property to be July 5, 2003; and,

3.  the trial court erred when it awarded Teague interest on the unpaid balance of the purchase price.

## II. STANDARD OF REVIEW

The standard of review of a trial court sitting without a jury is de novo upon the record. *Wright v. City of Knoxville,* 898 S.W.2d 177, 181 (Tenn. 1995). The trial court's findings of fact are presumed correct, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001) . Because trial courts are in a far better position than this court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App.1997). Consequently, where issues of credibility and weight of testimony are involved, appellate courts will accord considerable deference to the trial court's factual findings. *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999) (quoting *Collins v. Howmet Corp.*, 970 S.W.2d 941, 943 (Tenn. 1998) . No such presumption of correctness attaches to the trial court's conclusions of law. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001) .

To the extent the issues raised herein involve interpretation of written agreements, the question of interpretation of a contract is a question of law. *Guiliano v. CLEO, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999) . Therefore, the trial court's interpretation of a contractual document is not entitled to a presumption of correctness on appeal. *Id.; Angus v. Western Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). This court must review the document ourselves and make our own determination regarding its meaning and legal import. *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47(Tenn. Ct. App. 1993).

## III. ANALYSIS

### A.  Denial of Motion to Dismiss

The appellant first alleges the trial court erred by denying its motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12.02(6), Tennessee Rules of Civil Procedure. This assertion is based upon Harper-Wittbrodt's complaint alleging that Teague was required by the lease-option agreement to close the sale of the property on or before January 2, 2001. On the first appeal, this court ruled the closing was not required on or before January 2, 2001, but within a reasonable time, and remanded the case to the trial court for a determination of that issue.

On July 9, 2004, Teague moved to dismiss Harper-Wittbrodt's complaint because it sought specific performance based upon the allegation that Teague was in breach by failing to close January 2, 2001, and it was the law of the case that the agreement did not require a closing on or before that date. The trial court denied Teague's motion stating that while Harper-Wittbrodt had initially insisted Teague had an obligation to close on that date, the gravamen of the complaint was that Teague had failed to close the sale of the property as required by the lease agreement entitling Harper-Wittbrodt to specific performance.

The issues raised on a motion to dismiss are questions of law and the scope of review is de novo with no presumption of correctness. Tenn. R.App. P. 13(d); *Winchester v. Little*, 996 S.W.2d 818, 821 -822 (Tenn. Ct. App.1998). It is well established that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Fuerst v. Methodist Hospital South*, 566 S.W.2d 847, 848(Tenn.1978) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957). In ruling on a motion to dismiss, courts should construe the complaint liberally in favor of the plaintiff. *Fuerst* at 848-49. In accordance with these principles, we believe the trial court properly construed the gravamen of the complaint to be that Teague had failed to close the sale of the property as required by the lease agreement and appropriately denied the motion to dismiss. This issue is without merit.

### B. Award of Specific Performance

Teague next alleges the trial court erred by granting specific performance. This assertion is based on essentially the same ground as raised by Teague in his assignment relating to the denial of his motion to dismiss. Teague again alleges that the only breach alleged or testified to by the plaintiff was that Teague failed to close the sale of the transaction on or before January 2, 2001. Since this court ruled, on the first appeal, that he was not required to close on or before that date, Teague takes the position there was no breach by him that would entitle Harper-Wittbrodt to specific performance.

Again, this court previously determined that under the terms of the agreement between the parties, Teague was required to close the sale of the property within a reasonable time and remanded the case to the trial court for a determination of that issue. The issue was addressed at trial and the trial judge determined that, under the circumstances, the sale should have reasonably closed on or before July 5, 2003. While the trial court did not specifically find that Teague breached the agreement by failing to close the sale on or before that date, such a finding may be implied from its finding that Harper-Wittbrodt was entitled to specific performance.

Teague was placed on notice by the prior opinion of this court that the issue of what would constitute a reasonable time to close the sale of the property would be determined by the trial court. The trial court made known in its Memorandum Opinion on Motion for Summary Judgment, filed September 21, 2004, that it was construing the complaint to allege that Teague had not closed the transaction as required by the lease agreement, i.e. within a reasonable time. Evidence regarding this

issue was presented at trial without objection. Where issues not specifically raised by the pleadings are tried by express or implied consent of the parties, they are to be treated in all respects as if they had been raised in the pleadings. Rule 15.02, Tenn. R. Civ. P. Generally, trial by implied consent will be found where a party knew or reasonably should have known of the evidence relating to the new issue, did not object to this evidence, and was not prejudiced thereby. *Zack Cheek Builders, Inc. v. McLeod,* 597 S.W.2d 888, 890 (Tenn. 1980). We are of the opinion Teague impliedly consented to trial of the issue whether he had closed the sale of the property within a reasonable time.[2] He knew it was an issue to be determined by the trial court. Evidence relating to the issue was presented without objection. Teague was not prejudiced by introduction of the evidence or a litigation of the issue at trial. The issue was determined adversely to Teague in that the trial court found a reasonable time within which to close was on or before July 5, 2003, and obviously the transaction had not closed by that date. Thus, the issue will be treated "in all respects" as if it had been raised by the pleadings. We agree with the trial court that this was a proper case for specific performance.

### C. Alleged Breach of Harper-Wittbrodt

Teague further argues that he is absolved of performance under the lease agreement because of his assertions that Harper-Wittbrodt breached the agreement. The bases of his allegations are that Harper-Wittbrodt breached or repudiated the contract by taking the position the sale was to close on January 2, 2001; by failing to tender performance within a reasonable time after January 2, 2001; and by failing to perform its obligations to determine a purchase price. While the trial court failed to make specific findings of fact with regard to the alleged breach of Harper-Wittbrodt, it did find neither party liable for any breach of the agreement and further provided that all claims not addressed by the court in the final judgment be dismissed.

In order to serve as an anticipatory breach of contract or repudiation, the words and conduct of the contracting party must amount to a total and unqualified refusal to perform the contract. *Wright v. Wright,* 832 S.W.2d 542, 545(Tenn. Ct. App. 1991); *Brady v. Oliver,* 125 Tenn. 595, 147 S.W. 1135 (1911). In the alternative, a party may breach a contract by committing a voluntary act which renders the party unable or apparently unable to perform the contract. *Wright* at 545 (citing Restatement of Contracts 2d, § 250, p. 272.).

We have been cited to no evidence in the record that any representative of Harper-Wittbrodt either by words or conduct communicated an unqualified refusal to perform the contract relating to the option to purchase nor did Harper-Wittbrodt render itself unable to perform the contract. Its insistence that it had a right to close on January 2, 2001, was reasonably based upon language in the contract giving Harper-Wittbrodt, as the tenant, the right and option to purchase the property sixty

---

[2]At the conclusion of the proof, the attorney for Harper-Wittbrodt moved the court that the pleadings be amended to conform to the proof. The transcript does not indicate that the trial court made any ruling with regard to this motion. Rule 15.02 "does not require that a conforming amendment be made and there is no penalty for failing to do so. The rule clearly states that the absence of a formal amendment or a request for leave to amend 'does not affect the result of the trial' of those issues actually litigated." *Zack Cheek Builders, Inc. 597 S.W.2d* at 890 (citing 6 Wright & Miller, Federal Practice and Procedure § 1493, at 460-61(1971)

months following the execution date of the agreement provided proper notice was given. The agreement was dated January 2, 1996. There has been no dispute that proper notice was given concerning the option to buy. Harper-Wittbrodt took the position that the contract provided for a closing on that date. This court found other language in the contract, specifically, a term providing for proration of rent, indicated a recognition by the parties that the sale could close after the expiration of the leasehold period and, therefore, requiring the transaction be closed within a reasonable time. Nonetheless, the trial court apparently found Harper-Wittbrodt had a reasonable basis for its position and its insistence that the sale be closed on January 2, 2001, was not a breach or repudiation of the contract. The evidence does not preponderate against the apparent finding of the trial court that there was no breach by Harper-Wittbrodt with regard to this issue.

Teague also takes the position that Harper-Wittbrodt failed to make a tender of performance in accordance with the contract within a reasonable time. Harper-Wittbrodt did make a tender of what it considered its obligation under the contract on January 2, 2001. When Teague did not appear at that "closing," Harper-Wittbrodt filed suit for specific performance. On June 28, 2001, Harper-Wittbrodt was granted summary judgment in the trial court awarding specific performance based upon a purchase price equal to the amount tendered by it on January 2, 2001. This court's opinion reversing the trial court was filed November 6, 2002. The Mandate from this court was filed in the trial court on January 21, 2003. As the trial court noted in its Memorandum Opinion on Motion for Summary Judgment filed September 21, 2004:

> Teague has moved for summary judgment in his favor alleging that, since the closing has not occurred in three and one-half years of January 2, 2001, the closing did not occur within a reasonable time as a matter of law. Therefore, he argues, he is entitled to a summary judgment of dismissal. It would seem that a delay of three and one-half years would [not] be reasonable in most circumstances. This situation, however, is complicated by the fact of this litigation and the several proceedings pursuant thereto. Since this Court had ordered specific performance, the parties were entitled to rely upon or contest the issue on appeal. The opinion of the Court of Appeals settle[d] the issue on November 6, 2002. Thereafter, the parties disputed just about every aspect of the terms of the prospective purchase. A sale of property requires the agreement of both parties to all terms of the sale. If they cannot agree, no closing is possible. In this case, the parties require intervention of this Court to accomplish any closing or whether there will be a closing, the terms of closing (especially valuation of assets) and whether the lease requires a sale at all.

The evidence adduced at trial was consistent with the description of the trial court relating to the contentiousness of the parties subsequent to the appeal. Obviously, there could be no tender until the terms of the sale were either agreed upon between the parties or decreed by an order of the court. Again, the trial court apparently found that the failure of Harper-Wittbrodt to make a subsequent tender of performance following the first appeal of this case was not, under these conditions, a breach of the agreement or necessary to the awarding of specific performance. The evidence does not preponderate against the finding of the trial court.

There was evidence presented at trial that Harper-Wittbrodt was willing to complete the transaction once the terms of the sale had been determined. See *McCrea v. Smith*, 120 Tenn. 413, 430, 114 S.W. 729, 730(Tenn. 1908) (holding that a party seeking specific performance must show that he or she has done, offered to do or is willing to do the essential acts required by the agreement in order to be entitled to that remedy). The trial court granted specific performance on condition Harper-Wittbrodt tender the purchase price within 60 days of the date the judgment becomes final. We agree with the manner in which the trial court handled this issue.

Teague also alleges Harper-Wittbrodt breached the agreement by failing to provide a "fair market evaluation" of the leasehold improvements made by it within a reasonable time. As previously stated, according to the agreement, the purchase price was to be reduced by the fair market value of any and all improvements made by Harper-Wittbrodt. There is evidence Harper-Wittbrodt provided corporate records evidencing the value at which it carried these improvements on its books in November 2000. In December 2000, copies of the invoices for these improvements were provided Teague. Harper-Wittbrodt used the total amount of the invoices or $405,058.89 in computing the purchase price for the amount it tendered January 2, 2001. This was also the amount the trial court determined to be the appropriate reduction in purchase price when it awarded summary judgment.

On appeal, this court determined that construction of the agreement required the amount of the credit to be based upon "fair market value" rather than the costs of the improvements. On June 5, 2003, within seven months from the date this court's opinion was filed and about four and one-half months following the filing of this court's mandate in the trial court, Harper-Wittbrodt provided a consulting report prepared by Chris Chatham containing his opinion of the value of the improvements made by Harper-Wittbrodt. This opinion was based upon affidavits obtained by Harper-Wittbrodt's counsel from various construction contractors and laborers as to the current costs of making the improvements that had been made by Harper-Wittbrodt during the leasehold period. The contractors and laborers providing the affidavits either had actually performed the improvements or performed the type of construction involved in the Dickson County area. Some 33 laborers and contractors estimating the costs of 37 items are listed in Chatham's report. There is no proof in the record concerning what, if any, difficulty was experienced in obtaining these affidavits. In the opinion of this court whether Harper-Wittbrodt provided its appraisal within a reasonable time was not raised by the pleadings, litigated during the trial nor ruled upon by the trial court.

Normally, issues not raised in the trial court cannot be raised for the first time on appeal. *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991) (citing *Lovell v. Metropolitan Gov't*, 696 S.W.2d 2 (Tenn. 1985)); *Davis v. Tennessean*, 83 S.W.3d 125, 127 (Tenn. Ct. App. 2001). An issue not presented to, decided, or dealt with by the trial court will not be considered by appellate courts. *In re Adoption of a Female Child*, 42 S.W.3d 26, 32 (Tenn. 2001); *Reid v. State*, 9 S.W.3d 788, 796 (Tenn. Ct. App. 1999). Teague did, however, raise as an issue that Harper-Wittbrodt breached the agreement because it had not made a reasonable effort to close the transaction within a reasonable time. Assuming that allegation was based upon an alleged failure of Harper-Wittbrodt to provide an appraisal of the value of the leasehold improvements within a

timely manner, because that issue was not fully litigated in the trial court, this court has no basis for determining the evidence preponderates against the apparent finding of the trial court that Harper-Wittbrodt was not in breach of the agreement. Accordingly, this issue is without merit.

Finally, Teague alleges Harper-Wittbrodt breached the agreement by failing to vacate the property as provided for in the lease. The term of the lease expired January 2, 2001. Paragraph 28 of the lease agreement provided that should the tenant continue in possession after the end of the term with permission of the landlord, the holdover tenancy could be terminated by either party giving the other not less than 30 days notice. On February 27, 2001, Teague's counsel notified Harper-Wittbrodt's counsel in writing to vacate the premises on or before April 1, 2001. Teague's argument fails to take into account the construction given the provision for the proration of rent in Paragraph 31 of the lease agreement providing for an option to purchase. On the prior appeal, this court stated:

> The clause providing the option to purchase also stipulated that no rent would be applied to the purchase price, and that rent would be prorated to the date of closing. Since Harper-Wittbrodt had no right to purchase the property before January 2, the proration provision could have applied only to rent sums paid for periods between January 2 and the closing date.
>
> *Harper-Wittbrodt Auto. Group, LLC v. Teague*, No. M2001-02812-COA-R3-CV, 2002 Tenn. App. LEXIS 796, at *6 (Tenn. Ct. App. Nov. 6, 2002).

Thus, this court viewed this provision as allowing Harper-Wittbrodt to continue in possession at the leasehold rent between the end of the leasehold term and the date of closing. As explained below, reasonableness is a requirement in every contract. In our view, it would not be reasonable for Teague to have the ability to require Harper-Wittbrodt to vacate the premises after it had given proper notice of its intent to exercise the option to purchase absent an unjustified breach of the agreement by Harper-Wittbrodt.[3] Thus, we are of the opinion that a proper construction of the agreement is that the proration provision of Paragraph 31 of the agreement preempts the language of Paragraph 28 giving the landlord the right to terminate a holdover tenancy.

*D. Whether the trial court erred by failing to enforce the contract as written or to determine the purchase price based upon fair marked value.*

Teague next alleges the trial court erred by failing to enforce the option to purchase agreement as written. Specifically, he alleges the trial court modified the valuation mechanism provided for in the agreement and evaluating the improvements made by Harper-Wittbrodt on a cost basis. Harper-Wittbrodt alleges the court should have determined the fair market value of the property rather that fixing the option price for the property at the average of all the appraisals

---

[3]At the time the notice to vacate was given by Teague, he had not even obtained an appraisal of the property. Thus, it would appear his notice to vacate was simply an attempt to defeat Harper-Wittbrodt's right to exercise its option to purchase the property.

submitted. In order to evaluate the claims of the parties, we must in the first instance construe the agreement between the parties.

"The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). The purpose of interpreting a written contract is to ascertain and give effect to the contracting parties' intentions, and where the parties have reduced their agreement to writing, their intentions are reflected in the contract itself. *Id.; Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999) . "The intent of the parties is presumed to be that specifically expressed in the body of the contract . . . ." *Planters Gin Co.*, 78 S.W.3d at 890. Therefore, the court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. *Guiliano*, 995 S.W.2d at 95; *Bob Pearsall Motors, Inc. v. Regal Chrysler--Plymouth Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975) .

Where the language of the contract is clear and unambiguous, its literal meaning controls the outcome of contract disputes; but, where a contractual provision is ambiguous, i.e., susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language. *Planters Gin Co.*, 78 S.W.3d at 890. In that situation, courts must resort to other rules of construction, and only if ambiguity remains after application of the pertinent rules does the legal meaning of the contract become a question of fact. *Id.* However, a strained construction may not be placed on the language used by the parties to find or create ambiguity where none exists. *Id.* at 891.

Thus, courts defer to the contracting process by enforcing written contracts, which establish the rights and obligations of the parties, according to their plain terms without favoring either contracting party. *Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237(Tenn. 1985); *Hardeman County Bank v. Stallings*, 917 S.W.2d 695, 699(Tenn. Ct. App. 1995). Courts must avoid rewriting an agreement under the guise of interpreting it. *Marshall v. Jackson & Jones Oils, Inc.*, 20 S.W.3d 678, 682(Tenn. Ct. App. 1998). The courts will not make a new contract for parties who have spoken for themselves, *Petty v. Sloan*, 197 Tenn. 630, 640, 277 S.W.2d 355, 359(1955), and will not relieve parties of their contractual obligations simply because these obligations later prove to be burdensome or unwise. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 223(Tenn. Ct. App. 2002).

However, courts may and will incorporate a reasonableness requirement into any contract. *Moore v. Moore*, 603 S.W.2d 736, 739 (Tenn. Ct. App. 1980). In fact, this court has stated that the qualifying word "reasonable" must be read into every contract. *Minor v. Minor*, 863 S.W.2d 51, 54(Tenn. Ct. App. 1993). In *Minor*, because the contract did not include a time for performance, a reasonable time was implied, based upon *Moore* and upon the well-settled rule that missing contract terms may be implied. *Id.* Further, in construing contracts, courts must look at the language and the parties' intent and impose a construction that is fair and reasonable. *ACG, Inc. v. Southeast Elevator, Inc.* 912 S.W.2d 163 (Tenn. Ct. App. 1995). Reasonableness must be viewed in light of the parties'

situation at the time of the making of the agreement as well as at the time performance becomes due. *Hathaway v. Hathaway*, 98 S.W.3d 675, 680-81(Tenn. Ct. App. 2002). The language of a contract should be construed with reference to the situation of the parties, the business to which the contract relates, the subject matter of the agreement, the circumstances surrounding the transaction, and the construction placed on the contract by the parties in carrying out its terms. *Penske Truck Leasing Co., L.P. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990); *International Flight Center v. City of Murfreesboro*, 45 S.W.3d 565, 570(Tenn. Ct. App. 2001). Similarly, when a court is called upon to supply a missing term with a reasonable one, it must consider the subject matter of the contract, the situation of the parties, their intention in what they contemplated at the time the contract was made, and the circumstances attending the performance. *Minor*, 863 S.W.2d at 54.

Applying these principles to the case before us, we find the trial court was correct in its conclusion that the purchase price of the option agreement be determined by averaging the four appraisals submitted by the parties. The original agreement provided that, if the parties could not agree upon the fair market value of the property, each would obtain an appraisal and the purchase price would be determined by averaging the two appraisals. If either party did not agree with this average, then the party would notify the other and obtain a third appraisal. The third appraisal would then be averaged with the closest of the first two appraisals to arrive at a purchase price. The trial court correctly found that neither party followed the agreed upon procedure. Rather, both obtained two appraisals and both intended that their two appraisals be used in determining the purchase price. Since the contract between the parties contained no provision for the situation where both parties objected to the initial average between the first two appraisers and both obtained a subsequent appraisal, the trial court was left to supply this missing provision. In so doing the trial court considered the construction placed on the contract by the parties in carrying out its terms and found the parties had, by their conduct, modified the original agreement. Since both parties obtained two appraisals and both intended their two appraisals be used in determining the purchase price according to the contract between them, we find it appropriate to construe the contract in conformance with their conduct and intent in carrying it out. This result is reasonable and favors neither party. Neither party has suggested a more appropriate alternative for dealing with a situation that was not anticipated by the original agreement. Thus, we find no error in the method in which the trial court determined the purchase price pursuant to the agreement.

### E. Valuation of the leasehold improvements added by Harper-Wittbrodt.

As provided in the agreement, the purchase price for the property was to "be reduced in amount by the fair market value of any and all leasehold improvements made to the premises by Tenant." The trial court found the value of those improvements to be $480,000.00 and reduced the purchase price by that amount.

Teague first complains that the value of certain maintenance items were included in the improvements considered by the court. Among these are blacktop resurfacing, the replacement and upgrade of the main building heating and air conditioning unit and the installation of carpeting, flooring and wall coverings in the offices located on the premises. The position taken by the

Appellant overlooks the clear language of the agreement that the purchase price will be reduced by the fair market value of "any and all leasehold improvements." No exclusions were specified or indicated by the agreement. The trial court correctly included the value of all improvements made by Harper-Wittbrodt.

Teague next complains that the trial court erred by using the cost approach in valuing the improvements made by Harper-Wittbrodt. He makes this complaint despite the fact that every appraiser who testified as to the value of the entire premises testified the cost approach was the better method to use in arriving at a fair market value. Generally, the appraisers who testified valued the premises using one or both of two methods, the comparative sales approach and the cost approach. In the comparative sales approach, the appraiser found sales of similar properties and then translated those sales to a value of the premises by making adjustments for time, location, size and condition. In the cost approach, each appraiser first valued the land as if vacant. Next the appraiser estimated the current costs of replacing or reconstructing the improvements on the property. From this amount the appraiser deducted the depreciation of the improvement defined as diminished value caused by such factors as age, use, and obsolescence. The current cost of the improvement less accrued depreciation was the estimated fair market value of the improvement and when added to the value of the land was the estimated fair market value of the land determined by the cost approach. All four appraisers testified the better approach in valuating the Teague premises was the cost approach.

It should also be noted that the value of the premises estimated by each appraiser who also estimated a value using the comparative sales approach was significantly greater when using the cost approach. Robert K. Barnes, who appraised the property for Teague, valued the land at $1,950,000.00, using the cost approach, and $1,660,000.00, using the comparative sales approach. Carl D. Story who also appraised the property for Teague, estimated the value of the property to be $1,800,000.00, using the cost approach, and $1,620,000.00, using the comparative sales approach.[4]

Robert E. Moore, who appraised the property for Harper-Wittbrodt, testified the cost of the improvements made by Harper-Wittbrodt less any depreciation was $480,000.00. Mr. Moore indicated he did not significantly depreciate the improvements because they corrected functional problems that devalued the property before they were made. Chris Chatham, who also valued the property for Harper-Wittbrodt, testified the current costs of the improvements made by Harper-Wittbrodt was $481,019.79, and, in his opinion, those improvements increased the value of the premises by that amount. The only other testimony given concerning the value of the leasehold improvements made by Harper-Wittbrodt was that of Mr. Teague who stated his opinion that the improvements added no value to the property. The trial court adopted the cost approach method of Mr. Moore and Mr. Chatham in valuating the improvements made by Harper-Wittbrodt which was

[4]Chris Chatham, who appraised the property for Harper-Wittbrodt, used only the cost approach and estimated a value of $1,510,000.00. Robert E. Moore, who appraised the property for Harper-Wittbrodt, also used only the cost approach and estimated the value of the premises to be $1,550,000.00.

the same method used by all the appraisers in valuating the premises as a whole. Considering all of the evidence, we cannot say the evidence preponderates against the finding of the trial judge with regard to the value of these improvements.

### F. The determination of July 5, 2003, as the reasonable closing date.

Harper-Wittbrodt alleges the trial court erred in determining July 5, 2003, to be a reasonable closing date. This date was 30 days after Harper-Wittbrodt submitted a consultation report with regard to the value of the improvements Harper-Wittbrodt had added to the leased premises and for which it was to receive a reduction on the purchase price. Prior to that date, Harper-Wittbrodt had only submitted documentation relating to the historical costs of making these improvements. In the previous appeal of the case, this court stated that the fair market value of these improvements was not necessarily the cost of the improvements at the time they were made and until the value of these improvements was determined, a final purchase price could not be ascertained. *Harper-Wittbrodt Auto. Group, LLC v. Teague*, No. M2001-02812-COA-R3-CV, 2002 Tenn. App. LEXIS, at *7(Tenn. Ct. App. Nov. 6, 2002).

The first date any information was provided by either party concerning the fair market value of the leasehold improvements was June 5, 2003, when Chris Chatham submitted the consultation report stating his estimate of their current value. Harper-Wittbrodt argues that basing a reasonable closing date on the submission of this report absolves Teague of any responsibility in valuating the leasehold improvements. Obviously, Teague had no interest in assigning any value to the leasehold improvements since any value assigned would result in a reduction in the purchase price. In our view, it was reasonable for the trial court, under these circumstances, to require Harper-Wittbrodt to initially establish the amount it claimed as the fair market value of the leasehold improvements. We find no error in the trial court's establishing a reasonable closing date 30 days after that information was first made available.

### G. Prejudgment interest.

Harper-Wittbrodt alleges the trial court improperly awarded Teague prejudgment interest on the property's purchase price. In determining the relief to be granted to each of the parties, the trial court treated the transaction as having closed on July 5, 2003. Harper-Wittbrodt's lease payments were terminated as of that date. Harper-Wittbrodt was given credit for rent payments made to Teague after that date, totaling $120,087.90. Harper-Wittbrodt was given credit for mortgage payments made subsequent to that date. Teague was awarded interest on the purchase price from that date through the date of closing.

Tennessee Code Annotated section 47-14-123 provides, in pertinent part:

Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts

-15-

or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum . . .

A trial court has the discretion to award prejudgment interest. *Hunter v. Ura,* 163 S.W.3d 686, 706 (Tenn. 2005); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998) . The purpose of prejudgment interest "is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing." *Myint,* 970 S.W.2d at 927.

In formulating a remedy, the trial court cut off all income from the property going to Teague as of July 5, 2003. That was the date the trial court held the transaction should have closed. All income from the property received by Teague after that date was credited to Harper-Wittbrodt. It follows that the trial court correctly determined Teague should be awarded interest on the purchase price he would have received that date had the property closed. We find no abuse of discretion in the trial court's award of prejudgment interest from July 5, 2003, through the date of closing.

## IV.  CONCLUSION

The judgment of the trial court is affirmed in all respects and this matter is remanded with costs of appeal assessed against the Appellant, Sam Teague.

_____
DONALD P. HARRIS, SENIOR JUDGE