IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 18, 2014 Session

# HANNA (JOHN) NAZI, ET AL. V. JERRY'S OIL COMPANY INC.

Appeal from the Circuit Court for Madison County
No. C12289    Nathan B. Pride, Judge

No. W2013-02638-COA-R3-CV **- Filed July 18, 2014**

In this contract dispute, the parties disagree as to whether the signatory of the contracts may be personally liable thereon, as well as to whether the contract provides for a fuel surcharge. We affirm in part, vacate in part, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Vacated in Part; and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and ANDY D. BENNETT, J., joined.

Adam C. Crider, Jackson, Tennessee, for the appellant, Jerry's Oil Co., Inc.

Robert T. Keeton, III, Huntingdon, Tennessee, for the appellee, Hanna (John) Nazi and Banham (Ben) Nazi.

## OPINION

### Background

This case arises out of a dispute between Defendant/Counter-Plaintiff/Appellant Jerry's Oil Co., Inc. ("Jerry's Oil"), a fuel supplier, and the Handy Peddler, a retail service station owned and operated by Plaintiff/Counter-Defendants/Appellees, Hanna (John) Nazi ("John Nazi") and/or Banham (Ben) Nazi ("Ben Nazi," together with John Nazi, "Appellees"). There is no dispute in this case that the Handy Peddler operates as a sole

proprietorship, rather than a corporation. In the Spring of 2007, John Nazi executed four separate contracts with Jerry's Oil in order to purchase fuel and oil for the Handy Peddler: a Petroleum Purchase Contract, a Security Agreement, a Fuel Supply Agreement, and a Promissory Note. All of the contracts were prepared by Jerry's Oil. Of the four contracts entered into regarding Jerry's Oil supplying fuel and oil to the Handy Peddler, all were signed by John Nazi and none indicated that Ben Nazi was in any way involved.

The Petroleum Purchase Contract was executed on March 29, 2007. The introductory clause of the Petroleum Purchase Contract states that the contract is "by and between Handy Peddler and Jerry's Oil Company, Inc." John Nazi signed his name for Buyer's Representative, but indicated "Handy Peddler" thereunder. The Buyer is noted as "John Nazi Handy Peddler."

Also on March 29, 2007, John Nazi executed a Security Agreement on behalf of the Handy Peddler in favor of Jerry's Oil. The agreement provided that the Handy Peddler granted Jerry's Oil a security interest in the Handy Peddler's furniture, fixtures, equipment, inventory, machinery, and other items. On the Security Agreement, John Nazi signed his name, but thereunder indicated that his title was "Manager."

A few days later, on April 2, 2007, John Nazi executed a Fuel Supply Agreement. The alleged breach of this agreement is the central issue in this case. The Fuel Supply Agreement required the "Retailer" to pay Jerry's Oil for various obligations under the contract. The Retailer was defined by the contract as the Handy Peddler. On the signature block at the conclusion of the document, John Nazi executed the agreement by only signing "John Nazi." Although the Fuel Supply Agreement included a space for the signatory to designate his or her title, this space was left blank by John Nazi. Further, on April 20, 2007, John Nazi also executed a Promissory Note in favor of Jerry's Oil.[1] The Promissory Note specifically identified John Nazi "doing business as" the Handy Peddler, without any designation or title.

Under the Fuel Supply Agreement, Jerry's Oil agreed to supply Handy Peddler with fuel on an exclusive basis, and in exchange the Handy Peddler agreed to pay a price calculated pursuant to "Exhibit B." "Exhibit B," in turn, provides that gasoline cost would constitute the "BP rack price" plus a $0.01 markup. The diesel cost was similarly calculated as a $0.00 markup over the "BP rack price." Exhibit B further provides that the "rack price"

---

[1] The obligations pursuant to the Promissory Note are not at issue in this appeal. The Promissory Note is only at issue as evidence that relates to John Nazi's personal liability under the Fuel Supply Agreement.

is defined as Jerry's Oil's "actual cost, from time-to-time, for Fuel according to [Jerry's Oil's] most recent invoice for the appropriate grade of Fuel plus applicable taxes and freight." The agreement also set forth conditions for the Handy Peddler to become and remain a BP[2]-branded station and for earning potential rebates and incentive payments.

On June 29, 2012, Jerry's Oil filed suit in the General Sessions Court of Madison County against John Nazi, doing business as the Handy Peddler, for non-payment on outstanding fuel invoices pursuant to the Fuel Supply Agreement. Counsel for John Nazi then made it known that Ben Nazi, John Nazi's brother, was the sole proprietor of the Handy Peddler. An Amended Civil Summons was filed on August 28, 2012, in which Jerry's Oil added Ben Nazi as a defendant. The action alleged that John Nazi and/or Ben Nazi owned and operated Handy Peddler, and Jerry's Oil sought a judgment in the amount of $25,000 plus interest and attorney's fees. Following trial, judgment was entered against both John and Ben in the amount of $24,999.99, plus attorney's fees and court costs.

On November 9, 2012, Appellees appealed the judgment to Circuit Court and also filed a Complaint against Jerry's Oil for breach of contract, alleging that Jerry's Oil: (1) failed to provide earned rebates; (2) failed to provide earned incentives; and (3) charged a fuel surcharge on deliveries not authorized under the agreement.

Jerry's Oil filed an Answer denying the allegations and asserting that the claims are barred, in part, by the statute of limitations. Jerry's Oil also brought a Counter-Claim against Defendants for: (1) non-payment of outstanding fuel invoices; (2) lost profits on the remainder of the term of the agreement: (3) contractual indemnification under the agreement for failure of Handy Peddler to remain a BP-branded station; (4) punitive damages based on Handy Peddler holding out to the public that it was a BP-branded station; and (5) possession of personal property under the Security Agreement.

A bench trial was held on November 1, 2013. Specifically at issue in this appeal are the questions of whether John Nazi should be personally liable for breach of the Fuel Supply Agreement and whether fuel surcharges charged by Jerry's Oil throughout the duration of the parties' business relationship were authorized by the parties' contracts. With regard to the issue of John Nazi's individual liability, Appellees contend that John Nazi was merely serving as a manager for Ben Nazi, the true proprietor of the Handy Peddler, and that, as such, no personal liability may attach to John Nazi. In contrast, Jerry's Oil focused on the parties' contracts, as discussed above, which Jerry's Oil contended shows that John Nazi was the proprietor of the Handy Peddler.

---

[2] BP is sometimes referred to as British Petroleum.

The parties also disagreed as to whether a fuel surcharge was authorized by the contract. The term "fuel surcharge" is not found in any of the parties' contracts. Both John Nazi and Ben Nazi denied that they had contracted to pay a fuel surcharge. However, the Appellees admitted that they noticed the fuel surcharge during the performance of the contract, but decided not to dispute the charge until this lawsuit was filed. Another witness, Alan Kee, a dispatcher of Espey Oil Company, when asked whether a fuel surcharge was "industry standard," replied that "we [i.e., Espey Oil Company] don't charge fuel surcharge." Instead, he agreed that his company "just charge[s] freight and adjust[s] it accordingly." Moreover, Robert Gilliam, the sales manager in charge of the Handy Peddler's accounts for Jerry's Oil during the time period at issue, answered in the negative when asked whether "a fuel surcharge was ever contracted with the Handy Peddler for delivery of fuel?" However, Jerry Wilhite, the owner of Jerry's Oil, testified that the term "freight" as used in Exhibit B, necessarily includes a fuel surcharge, which takes into account the rising cost of transportation of the fuel. According to Mr. Wilhite, the authorized freight charge was calculated as the sum of two related charges: the "base freight charge" of $0.05 per gallon of fuel purchased and a "fuel surcharge" calculated by multiplying the base freight charge by a figure generated weekly by the United States Department of Energy. In the invoices sent to the Handy Peddler, the charges were separated. Mr. Wilhite testified that this charge was customary in the industry.

After Jerry's Oil presented its case, John Nazi moved for a directed verdict (more properly termed an involuntary dismissal in a bench trial, discussed in detail, *infra*) on the issue of John Nazi's individual liability as an owner of the Handy Peddler. The court found that Jerry's Oil failed to prove its case against John Nazi, individually, and dismissed all claims as to John Nazi. In ruling on this issue, the court stated that there was nothing indicating that John Nazi was acting as an owner from 2011 through 2012, when the alleged breach occurred. Thereafter, John Nazi voluntarily dismissed his claims against Jerry's Oil.

At the close of trial, the court entered judgment in favor of Jerry's Oil on its breach of contract claim for non-payment of the fuel invoices and lost profits. The court denied Jerry's Oil's claim for indemnification for any charges that may have been owed to BP. With respect to Ben Nazi's claims, the court found in favor of Jerry's Oil on the rebates and incentives, but ruled for Ben Nazi on the issue of the fuel surcharge, concluding that such a charge was not contemplated in the parties' contract. After offsetting damages awarded to Ben Nazi, the final judgment was entered against Ben Nazi totaling $99,875.71, plus court costs. Written orders on the dismissal of the claims against John Nazi and the remaining issues were entered on November 8, 2013, and November 15, 2013, respectively. The order dismissing the claims against John Nazi also noted that the claims asserted by John Nazi had been voluntarily dismissed. While this appeal was pending, the trial court entered an order granting Jerry's Oil's claims for possession of personal property pursuant to the Security

Agreement and denying any claims for punitive damages. Jerry's Oil appealed.

## Issues Presented

Only two issues are presented in this appeal, as stated by Jerry's Oil in its brief:

1.    Whether the trial court erred by granting John Nazi's Motion for Directed Verdict on Jerry's Oil's claims for damages against John Nazi individually.
2.    Whether the trial court erred by finding for John and Ben Nazi on the issue of Jerry's Oil's liability for breach of contract related to the fuel surcharge.

3.

## Analysis

## Preliminary Matters

Before we can consider the substantive issues in this case, we must first discuss certain preliminary matters that make resolution of the issues in this appeal more onerous. We begin first with Jerry's Oil's argument regarding the dismissal of the claims against John Nazi. Specifically, Jerry's Oil argues that the trial court improperly granted a directed verdict in John Nazi's favor because the trial court was required to take "the strongest legitimate view of the evidence" and disregard "all countervailing evidence."

Jerry's Oil's argument on this issue is erroneous. Here, John Nazi moved for a directed verdict at the close of Jerry's Oil's proof. However, a motion for a directed verdict is not a proper motion in a bench trial. *See **Burton v. Warren Farmers Co-op.***, 129 S.W.3d 513, 520 (Tenn. Ct. App. 2002). Instead, a motion to dismiss a case at the close of plaintiff's proof in a bench trial is governed by Rule 41.02 of the Tennessee Rules of Civil Procedure.[3]

_____

[3] Rule 41.02(2) of the Tennessee Rules of Civil Procedure provides:

> After the plaintiff in an action tried by the court without a jury has completed the presentation of plaintiffs evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court shall reserve ruling until all parties alleging fault against any other party have presented their respective

As this Court has previously explained:

> A Tenn. R. Civ. P. 41.02(2) motion for involuntary dismissal differs markedly from a Tenn. R. Civ. P. 50 motion for a directed verdict. The most obvious, yet most overlooked, difference is that motions for directed verdicts have no place in bench trials, while Tenn. R. Civ. P. 41.02(2) motions have no place in jury trials. *Cunningham v. Shelton Sec. Serv., Inc.*, 46 S.W.3d 131, 135 n.1 (Tenn. 2001); *City of Columbia v. C.F.W. Constr. Co.*, 557 S.W.2d 734, 740 (Tenn. 1977); *Scott v. Pulley*, 705 S.W.2d 666, 672 (Tenn. Ct. App. 1985). Beyond this obvious procedural difference, motions for involuntary dismissal serve a different purpose than motions for directed verdict and require the courts to employ a substantially different method of analysis.
>
> A Tenn. R. Civ. P. 50 motion for directed verdict provides a vehicle for deciding questions of law. The question presented is whether the plaintiff has presented sufficient evidence to create an issue of fact for the jury to decide. *Spann v. Abraham*, 36 S.W.3d 452, 462 (Tenn. Ct. App. 1999); *Ingram v. Earthman*, 993 S.W.2d 611, 626 (Tenn. Ct. App. 1998). The courts do not weigh the evidence when they answer this question, *Conatser v. Clarksville Coca–Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995), nor do they evaluate the credibility of the witnesses. *Richardson v. Miller*, 44 S.W.3d 1, 30 (Tenn. Ct. App. 2000). Rather, they review the evidence in the light most favorable to the non-moving party, give the non-moving party the benefit of all reasonable inferences, and disregard all the evidence contrary to the non-moving party's position. *Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000); *Addaman v. Lanford*, 46 S.W.3d 199, 203 (Tenn. Ct. App. 2000).

---

proof-in-chief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court grants the motion for involuntary dismissal, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment.

* * *

Motions for involuntary dismissal pursuant to Tenn. R. Civ. P. 41.02(2) require the courts to engage in an entirely different analysis. These motions do not raise questions of law but rather challenge the sufficiency of the plaintiff's proof. *Smith v. Inman Realty Co.*, 846 S.W.2d 819, 821 (Tenn. Ct. App. 1992); *Merriman v. Smith*, 599 S.W.2d 548, 560 (Tenn. Ct. App. 1979). A claim may be dismissed pursuant to a Tenn. R. Civ. P. 41.02(2) motion to dismiss if, based on the law and the evidence, the plaintiff has failed to demonstrate a right to the relief it is seeking. *City of Columbia v. C.F.W. Constr. Co.*, 557 S.W.2d at 740. Motions under Tenn. R. Civ. P. 41.02(2) require less certainty than motions for directed verdict. *Smith v. Inman Realty Co.*, 846 S.W.2d at 822.

*Burton*, 129 S.W.3d at 520.

In similar cases wherein a defendant has moved for a directed verdict in a bench trial, this Court has construed the motion as one for involuntary dismissal pursuant to Rule 41.02(2). *See, e.g., Kathryne B.F. v. Michael B.*, No. W2013-01757-COA-R3-CV, 2014 WL 992110, at *3 n.2 (Tenn. Ct. App. March 13, 2014); *In re Adoption of Jordan F.J.*, No. W2013-00427-COA-R3-PT, 2013 WL 6118416, * (Tenn. Ct. App. Nov. 20, 2013); *Wilson v. Monroe County*, 411 S.W.3d 431, 438–39 (Tenn. Ct. App. 2013). Accordingly, despite Jerry's Oil's assertion that this Court must give the strongest legitimate view to its evidence and disregard all countervailing proof, we review the trial court's decision to grant an involuntary dismissal under the far less stringent standard outlined in Rule 13 of the Tennessee Rules of Appellate Procedure.[4] As explained by this Court:

[On appeal] [t]his court uses the familiar Tenn. R. App. P. 13(d)

---

[4]Rule 13 of the Tennessee Rules of Appellate Procedure provides, in pertinent part:

Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise.

Tenn. R. App. P. 13(d).

standard to review a trial court's disposition of a Tenn. R. Civ. P. 41.02(2) motion because the trial court has used the same reasoning to dispose of the motion that it would have used to make a final decision at the close of all the evidence. Thus, we must review the record on appeal *de novo* with a presumption that the trial court's findings are correct. We will affirm the trial court's decision unless the evidence preponderates against the trial court's factual determinations or unless the trial court has committed an error of law affecting the outcome of the case. We give great weight to the trial court's assessment of the evidence because the trial court is in a much better position to evaluate the credibility of the witnesses.

***Wilson***, 411 S.W.3d at 439 (quoting ***Burton***, 129 S.W.3d at 521). Thus, this Court will review the trial court's decision to grant an involuntary dismissal under the same standard applicable for factual findings and legal conclusions made at the conclusion of a bench trial. The same standard will apply to the question of whether the trial court properly granted Ben Nazi damages for the fuel surcharge.

Having determined the proper standard for this Court to review the trial court's decision to dismiss the claims against John Nazi, we are now faced with the question of whether the trial properly granted the involuntary dismissal. Our review, however, is again constrained by the fact that the trial court's order granting the dismissal contains no findings of fact or conclusions of law, nor are any of the trial court's oral pronouncements incorporated into the written order by reference. *See **Alexander v. JB Partners***, 380 S.W.3d 772, 777 (Tenn. Ct. App. 2011) ("It is well settled, however, that a court speaks through its orders and not through the transcript.") (citing ***Steppach v. Thomas***, 346 S.W.3d 488, 522 (Tenn. Ct. App. 2011)). Further, the order subsequently entered on the remaining issues in this case also fails to contain any findings of fact or conclusions of law. These omissions are inconsistent with the Tennessee Rules of Civil Procedure.

First, we consider the trial court's order grant of the involuntary dismissal. The plain language of Rule 41.02 requires that: "If the court grants the motion for involuntary dismissal, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." As previously discussed, nothing in the trial court's written order includes findings of fact or conclusions of law in compliance with Rule 41.02. Rule 41.02's requirement is consistent with the Tennessee Rules of Civil Procedure's requirement with regard to bench trials as a whole. Indeed, Rule 52.01 of the Tennessee Rules of Civil Procedure provides, in pertinent part:

In all actions tried upon the facts without a jury, **the court shall find the facts specially and shall state separately its conclusions of law** and direct the entry of the appropriate judgment. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein.

*Id.* (emphasis added). Prior to July 1, 2009, trial courts were only required to make specific findings of fact and conclusions of law "upon request made by any party prior to the entry of judgment." *See* ***Poole v. Union Planters Bank N.A.***, No. W2009-01507-COA-R3-CV, 337 S.W.3d 771, 791 (Tenn. Ct. App. 2010) (noting the amendment). However, the current version of Rule 52.01 requires the court to make these findings regardless of a request by either party. *Id.* Thus, neither the November 8, 2013 order granting the involuntary dismissal or the November 15, 2013 order disposing of the remaining issues in the case comport with Rule 52.01.

This Court has previously held that the requirement to make findings of fact and conclusions of law is "not a mere technicality." ***In re K.H.***, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *8 (Tenn. Ct. App. May 15, 2009). Instead, the requirement serves the important purpose of "facilitat[ing] appellate review and promot[ing] the just and speedy resolution of appeals." *Id.*; ***White v. Moody***, 171 S.W.3d 187, 191 (Tenn. Ct. App. 2004); ***Bruce v. Bruce***, 801 S.W.2d 102, 104 (Tenn. Ct. App. 1990). "Without such findings and conclusions, this court is left to wonder on what basis the court reached its ultimate decision." ***In re K.H.***, 2009 WL 1362314, at *8 (quoting ***In re M.E.W.***, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *19 (Tenn. Ct. App. April 21, 2004)). Generally, the appropriate remedy when a trial court fails to make appropriate findings of fact and conclusions of law is to "vacate the trial court's judgment and remand the cause to the trial court for written findings of fact and conclusions of law." ***Lake v. Haynes***, No. W2010-00294-COA-R3-CV, 2011 WL 2361563, at *1 (Tenn. Ct. App. June 9, 2011). However, this Court has indicated that we may "soldier on" with our review despite the trial court's failure to make sufficient findings of fact and conclusions of law, in certain limited circumstances:

On occasion, when a trial judge fails to make findings of fact and conclusions of law, the appellate court "may 'soldier on' when the case involves only a clear legal issue, or when the court's decision is 'readily ascertainable.'" ***Hanson v. J.C. Hobbs Co., Inc.***, No. W2011-02523-COA-R3-CV, 2012 WL

5873582, at *10 (Tenn. Ct. App. Nov. 21, 2012) (quoting
*Simpson v. Fowler*, No. W2011-02112-COA-R3-CV, 2012 WL
3675321, at *4 (Tenn. Ct. App. Aug. 28, 2012)).

*Pandey v. Shrivastava*, No. W2012-00059-COA-R3-CV, 2013 WL 657799, at *5 (Tenn. Ct. App. Feb. 22, 2013). Here, although they are not incorporated into either of the two orders at issue,[5] the trial court did make some findings of fact with regard to the two issues raised in this appeal: the dismissal of the claims against John Nazi, and the award of damages for the allegedly improperly charged fuel surcharge. Thus, the trial court's decisions on these specific issues are "readily ascertainable." *Pandey*, 2013 WL 657799, at *5. Accordingly, we will endeavor to consider the substantive issues raised in this appeal despite the lack of written findings of fact and conclusions of law in the orders before us.

### Involuntary Dismissal

Turning to the substantive issues in this case, Jerry's Oil first argues that the trial court erred in dismissing the claims against John Nazi in his individual capacity. This issue is somewhat unusual because it involves a sole proprietorship rather than a partnership, corporation, or other limited liability entity. Accordingly, a brief discussion of the sole proprietorship is helpful to the resolution of this issue. According to the Tennessee Practice Series:

> The individual proprietorship or sole proprietorship—the two terms being interchangeable—is the oldest, simplest, and most prevalent form of business enterprise. Rules of contract, torts, property, and agency law loom large in its legal character.
> An individual may carry on business as sole proprietor. Such assistance as is needed in the way of service may be procured by hiring others, with whom the proprietor enters into the relation of master and servant, or principal and agent. . . . If there are losses, the proprietor must bear them alone, to the extent of business and personal resources. If there are profits, the proprietor does not have to share them, absent any agreement to compensate employees, the landlord, or the money lender with a share of profits in lieu of fixed wages, rent, or interest.
> In short, the individual proprietor is the "boss," personally employing others as employees or agents. **The**

---

[5] We note that both orders were prepared by counsel, rather than drafted by the trial court.

**business contracts—those made personally or by agents within their actual or apparent authority or, when made beyond the agency power, ratified—are the proprietor's contracts.**

\* \* \*

The relation of master and servant or principal and agent or employer and employee exists between the proprietor and anyone else associated with the enterprise. The proprietor retains all the profits of the business and likewise must bear all the losses, and remains fully liable for any business debts even though the business is dissolved.

14A Tenn. Prac., <u>Legal Forms Business Organizations</u> § 12:1 (emphasis added). In this case, John Nazi argues that he was merely an agent of his brother Ben Nazi, the true owner of the Handy Peddler, and that as such, personal liability for the fuel supply contract cannot attach to him.[6]

In granting the dismissal, the trial court stated:

We have conflicting testimony in regard to Mr. John Nazi's relationship to the business. It's clear that when the contracts were first signed back in March of 2007 he said that Ben Nazi was sick and he was acting on behalf of his brother as agent for him, and I don't think there's nothing that keeps him from acting as that. Whether he knew he should have put agent or so forth on there, I don't know. But he signed some documents without saying he was owner, some documents saying he was manager. He just said Handy Peddler. He signed John Nazi. Didn't say slash owner or anything like that.

The document that he did sign that said owner was not prepared by him, but prepared, in fact, by Jerry's Oil Company. According to his testimony, Mr. Gilliam [a sales manager at Jerry's Oil] . . . prepared those documents. But the relevant period here is what happened during the period that the invoice was unpaid was determined, and that was from 2011 and 2012

---

[6] On appeal, there is no dispute that Ben Nazi would be personally liable for any liability that attaches to the Handy Peddler on the fuel contract.

when he said that he was no longer involved with the business, started his own business, went to New York and came back. So for that time period I have nothing that indicates that he was acting as owner at that time. So I'm going to dismiss Mr. John Nazi from the lawsuit as being a party defendant . . . .

Having considered the evidence in the record, we agree with the trial court's conclusion that there was no evidence that John Nazi was involved in the Handy Peddler as of 2011 and 2012, when the alleged breach occurred. However, unlike the trial court, we do not agree that this fact ends the inquiry as to whether John Nazi may be personally liable on the fuel contract. Instead, that question must be determined by a close examination of the contract upon which this breach of contract case is predicated. *See 84 Lumber Co. v. Smith*, 356 S.W.3d 380, 382–83 (Tenn. 2011). Further, there is no evidence in the record that the contracts were amended prior to the alleged breaches in 2011 and/or 2012. Thus, the relevant time period is when the contracts at issue were signed, rather than when the alleged breach occurred. Indeed, it is well-settled that the intent of the contracting parties **at the time of executing the agreement** should govern. *See Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002) (emphasis added). For these reasons, as fully explained below, we must vacate the trial court's judgment and remand for reconsideration.

In determining when an individual is liable on a business contract, our Supreme Court has offered some guidance:

> In most cases, a representative who signs a contract is not personally bound to the contract. *See Dominion Bank of Middle Tenn. v. Crane*, 843 S.W.2d 14, 19 (Tenn. Ct. App. 1992); *Anderson v. Davis*, 34 Tenn. App. 116, 234 S.W.2d 368, 369–70 (1950). A representative who signs a contract may be personally bound, however, when the clear intent of the contract is to bind the representative. *See Lazarov v. Klyce*, 195 Tenn. 27, 255 S.W.2d 11, 14 (1953) (citing *Pope v. Landy*, 1 A.2d 589 (Del. Super. Ct. 1938)) ("**Whether or not a particular contract shows a clear intent that one of the parties was contracting as an individual or in a representative capacity, must be determined from the contract itself**.").
>
> When we interpret a contract, our role is to ascertain the intention of the parties. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). The intention of the parties is based on the ordinary meaning of the language contained within the four

corners of the contract. *Kiser v. Wolfe*, 353 S.W.3d 741, 747 (Tenn. 2011); *see* *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889–90 (Tenn. 2002). The interpretation of a contract is a matter of law, which we review de novo with no presumption of correctness. *Barnes v. Barnes*, 193 S.W.3d 495, 498 (Tenn. 2006).

*84 Lumber Co. v. Smith*, 356 S.W.3d 380, 382–83 (Tenn. 2011) (emphasis added). In *84 Lumber*, the Tennessee Supreme Court considered "whether [a corporation's president's] signature on the credit application can bind him in both a representative capacity and as a guarantor to the contract or whether he can be bound as a guarantor only if he signed the application a second time in his individual capacity." *Id.* at 383. The president signed his name to the contract and clearly indicated that he was signing as a representative of the corporation. The Court held that a representative of a corporation may sign a contract in both a representative capacity and an individual capacity. *Id.*[7]

In making its decision that the president had signed in both capacities, the Court considered the plain language of the contract, which provided that: "I DO UNCONDITIONALLY . . . PERSONALLY GUARANTEE THIS CREDIT ACCOUNT AND PAYMENTS OF ANY AND ALL AMOUNTS DUE BY THE ABOVE BUSINESS." *Id.* The Court concluded that the above language "establishes that the person signing the application agrees to serve as the guarantor of the account established for the benefit of the 'above business.'" *Id.* Further, the Court noted that the above language:

> [C]learly distinguishes between "I," the person signing the contract, and the "above business." The contract also contains terms and conditions that apply to both the "applicant" and the "personal guarantor." These provisions demonstrate that the parties intended that the individual who signed the contract agreed to be personally responsible for amounts owed on the contract.

*Id.* (footnote omitted). Thus, the Court held that the corporation's president could be personally liable on the guaranty, regardless of the fact that the president clearly indicated that he was signing the contract in a representative capacity. *Id.* at 383–84.

The situation presented in this case is not analogous to the situation in *84 Lumber*.

---

[7] There appears to have been no dispute that the defendant president in *84 Lumber* could and did sign the contract in a representative capacity, binding the corporation of which he was president.

First, *84 Lumber* concerned a contract entered into by a corporation, rather than a sole proprietorship. Further, the issue in *84 Lumber* was with regard to a personal guaranty on the contract, rather than the obligations in the underlying contract. In contrast, the only issue raised in this appeal concerns the obligation to pay the underlying contract.[8] Further, the contract at issue requires that all payment obligations under the contract apply to the Retailer. The Retailer is specifically defined as the Handy Peddler. Nothing in the contracts indicate any intent to bind John Nazi personally, except through his alleged role as the sole proprietor of the Handy Peddler. Thus, unlike in *84 Lumber*, the contracts do not unambiguously illustrate the clear intent to bind John Nazi in his individual capacity. *See id.* (requiring, in order to impose personal liability on a representative of a corporation, "the clear intent . . . to bind the representative" in an individual capacity).

The question remains, however, whether the contracts indicate that John Nazi is, in fact, the sole proprietor of the Handy Peddler, or if he is signing as a representative of another individual. The parties have cited no law with respect to the question of whether an individual signing a contract is the actual owner of a sole proprietorship, when there has been an allegation that another individual is the actual owner. Based on our review of the contracts at issue, we conclude that they are ambiguous as to whether John Nazi was signing the contracts as the owner of the Handy Peddler, or merely as its manager/representative. Further, we conclude that other evidence in the record on this issue is also conflicting.

As previously discussed, in order to determine the parties' intent, we look to the "ordinary meaning of the language contained within the four corners of the contract." *84 Lumber Co.*, 356 S.W.3d at 383. Only when there is an ambiguity in the language of the contract, will this Court consider extrinsic evidence as to its meaning. *Cummings Inc. v. Dorgan*, 320 S.W.3d 316, 333 (Tenn. Ct. App. 2009) (" If a contract is ambiguous, then a court may look beyond the four corners of the document and consider extrinsic evidence in order to determine the parties' intention[.]"). Thus, we begin first with a review of the language contained in the contracts at issue.

The breach of contract claims in this case concern the Fuel Supply Agreement signed by John Nazi on April 2, 2007. The Fuel Supply Agreement specifically states that it is between Jerry's Oil and the Handy Peddler, which is termed the "Retailer" throughout the contract. The Retailer is the only party mentioned with regard to the obligation to pay Jerry's Oil under the contract. Further, the Fuel Supply Agreement notes that all correspondence

---

[8] The contract does contain terms relating to a guaranty on the contract. However, neither John Nazi nor Ben Nazi signed the contract as guarantor, nor is that term otherwise defined in the contract. Further, Jerry's Oil did not appear to argue in the trial court that John Nazi was liable as a guarantor, but only that he was liable as the sole proprietor of the Handy Peddler.

pursuant to the contract should be sent "c/o" John Nazi. Thus, the only person connected in anyway with the Handy Peddler in the Fuel Supply Agreement is John Nazi. Unlike the situation presented wherein a representative is signing a contract on behalf of a corporation, this situation involves a sole proprietorship. A sole proprietorship necessarily involves individual liability. *See **Dexter Ridge Shopping Center, LLC v. Little***, 358 S.W.3d 597, 608 n.8 (Tenn. Ct. App. 2010) (noting that because the business was a sole proprietorship, the question was whether its owner/proprietor was liable, as the business did not constitute a "separate legal entity").

The Fuel Supply Agreement also includes a space wherein the signatory on behalf of the Retailer may indicate his or her title with the company. John Nazi did not take advantage of this space to indicate that he was not the owner of the Handy Peddler. Thus, nothing in the Fuel Supply Agreement indicates that John Nazi was signing the contract as a representative of another sole proprietor. Ben Nazi's name is not mentioned in the contract, nor is there any other indication that John Nazi is acting on behalf of another person. Because John Nazi is claiming that he was only a representative of the true owner of the Handy Peddler, this situation is similar to the situation wherein a corporate representative signs a contract without designating that he or she is merely a representative. For example, in **Lazarov v. Klyce**, 31 Beeler 27, 255 S.W.2d 11 (Tenn. 1953), the Tennessee Supreme Court held that: "[A]n officer of a corporation who signs, without adding any words to his signature . . . cannot show by parol evidence that a corporate liability was intended." **Id.** at 13 (citing 8 Am.Jur., Bills & Notes, §500, p. 229). In **Lazarov**, one signatory of the contract indicated that he was signing on behalf of the corporation. The defendant signatory included no such notation next to his signature. **Lazarov**, 255 S.W.2d at 12–13. Under those circumstances, the Court held that the defendant signatory could not submit parol evidence to show that he was merely signing in a representative capacity. A similar situation recently occurred in **Mudd v. Goostree**, No. M2012-00957-COA-R3-CV, 2013 WL 1402157 (Tenn. Ct. App. April 5, 2013), wherein a corporate representative signed a lease, under the space marked "Tenant," without any indication that he was signing in a representative capacity. **Id.** at *1. The Tennessee Court of Appeals held that the representative could be personally liable for damages as a result of the breach of lease, and that no parol evidence was admissible to show that he was only signing in a representative capacity. **Id.** at *2. As explained by the Court:

> In the case before us, however, in the space provided for Tenant's name and signature, Appellant printed his name and, on the line preceded by the word "By", signed his name. This is a clear and unambiguous designation of Appellant as the Tenant on the lease agreement. Only if a contract is ambiguous does a court look beyond the four corners of the document and consider evidence of the parties' intentions.

-15-

*Id.* (citing *Cummings, Inc. v. Dorgan*, 320 S.W.3d 316, 333 (Tenn. Ct. App. 2009)). Thus, the failure to indicate that a party is signing in a representative capacity was held fatal to a claim that the individual was merely signing in a representative capacity. The Fuel Supply Agreement, however, is not the only contract entered into by the parties with regard to this contract. The parties also entered into a Promissory Note, a contract to purchase petroleum products, and a Security Agreement around the same time as the Fuel Supply Agreement. *See* 11 Williston on Contracts § 30:25 (4th ed.) ("Generally, all writings which are part of the same transaction are interpreted together."). The Petroleum Purchase Contract indicates that John Nazi is the "Buyer's Representative;" however, there is no indication that this means that John Nazi is merely an agent of Ben Nazi, the alleged true sole proprietor of the Handy Peddler. Because the Handy Peddler is a sole proprietorship, it essentially is its representative. *See* 18 C.J.S. Corporations § 4 ("A sole proprietorship has no separate legal existence or identity apart from the sole proprietor."); *see also* *Ferguson v. Jenkins*, 204 S.W.3d 779, 786 (Tenn. Ct. App. 2006) (noting that with regard to a sole proprietorship, the owner and the business are "one and the same"); *Koch v. Koch*, 874 S.W.2d 571, 576 (Tenn. Ct. App. 1993) ("[A] sole proprietorship is nothing more than an individual conducting a business for profit, which in turn becomes his income."). The only individual mentioned in any of these contracts is John Nazi. Further, neither the Fuel Supply Agreement nor the Petroleum Purchase Agreement indicate that John Nazi is signing on behalf of another proprietor. Therefore, following the reasoning in *Lazarov* and *Mudd*, these contracts unambiguously indicate the John Nazi is the proprietor of the Handy Peddler.

Further, the Promissory Note indicates that John Nazi is "doing business as" the Handy Peddler. However, the Promissory Note is again signed by John Nazi without any indication that the signature is representative of another individual. In *Simpson Operating Co., Inc. v. Schwotzer*, No. 1362, 1990 WL 130829 (Tenn. Ct. App. 1990), *perm. app. denied* (Tenn. Dec. 31, 1990), this Court was faced with another question of whether an individual who signed a lease, signed in his personal or representative capacity. *Id.* at *1. The Court of Appeals concluded that the defendant signed in his personal capacity, despite the fact that the preamble to the lease indicated that the tenant was "Eric H. Schwotzer d/b/a[9] Gem Parlor, Inc." *Id.* According to the Court: "The words 'doing business as" denote a trade name, or fictitious name, and is merely descriptive of [the defendant] or his business." *Id.* Because Mr. Schwotzer signed the lease without indicating that he was signing merely as a representative of the business entity, the Court held that he could be personally liable. *Id.* Thus, the Promissory Note also unambiguously indicates that John Nazi was not signing on behalf of another proprietor.

---

[9] "D/b/a" refers to "doing business as."

In contrast, however, the March 29, 2007 Security Agreement[10] does indicate that John Nazi's title is merely "manager." John Nazi argues that this, as well as his failure to expressly indicate that he was the owner of the Handy Peddler anywhere in the other contracts, conclusively shows that he was merely a manager of the Handy Peddler and not its proprietor. We respectfully disagree. In another case wherein only portions of a contract indicated that the signatories were signing as representatives, while other portions of the contracts indicated that the signatories were signing as individuals, the Tennessee Supreme Court concluded that an ambiguity existed justifying the admission of parol evidence. In *Wilson v. Clinton Chapel African M.E. Zion Church*, 138 Tenn. 398, 198 S.W 244 (Tenn. 1917), the Tennessee Supreme Court held that an ambiguity existed as to the personal liability of the signatories, when on the bottom of the contract, a note was handwritten that the signatories were "trustees A. M. E. Zion Church." *Id.* at 246. Thus, the Court vacated the judgment and remanded for the trial court to consider parol evidence regarding whether the signatories were signing the contract in a representative capacity. *Id.*; *see also Lazarov*, 255 S.W.2d at 13 (citing *Wilson* with approval).

We likewise conclude that John Nazi's decision to sign the different contracts pertinent to this transaction in different ways creates an ambiguity as to the proprietor of the Handy Peddler. Thus, the trial court was entitled to consider other evidence to determine whether John Nazi was holding himself out as Handy Peddler's owner. As explained by this Court:

> [W]here a contractual provision is ambiguous, i.e., susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language. In that situation, courts must resort to other rules of construction, and only if ambiguity remains after application of the pertinent rules does the legal meaning of the contract become a question of fact. Then, the court must examine other evidence to ascertain that intention. Such evidence might include the negotiations leading up to the contract, the course of conduct the parties followed as they performed the contract, and any utterances of the parties that might shed light upon their intentions.

---

[10] Although the trial transcript clearly reflects that the Security Agreement was admitted as an exhibit, the Security Agreement is not included in the record from the trial. The Security Agreement, however, is included in Jerry's Oil's Answer to the Complaint, which was filed as a supplement to the record in this Court.

*Cummings*, 320 S.W.3d at 333 (quoting *Stephenson v. The Third Co.*, M2002-02082-COA-R3-CV, 2004 WL 383317, at *4 (Tenn. Ct. App. Feb. 27, 2004) (citations omitted)). Because we conclude that the contracts are ambiguous as to whether John Nazi was signing as the owner/proprietor of the Handy Peddler, or merely as its manager, we will consider extrinsic evidence to determine the parties' intent.

From our review of the trial transcript, there was conflicting testimony as to whether John Nazi was acting as the owner/proprietor of the Handy Peddler. As previously discussed, John Nazi testified that he never acted as the owner of the Handy Peddler. John Nazi also testified that he never held himself out to be the owner/proprietor of the Handy Peddler, but that he was merely serving as his brother's manager during a time when Ben Nazi was too ill to run the business. Further, John Nazi testified that he had no contact with the Handy Peddler in 2011 and 2012, when the alleged breach occurred. Ben Nazi also testified that it was understood that John Nazi was merely the manager for the Handy Peddler during the time that John Nazi signed the contracts at issue. However, Mr. Wilhite testified that all contracts with the Handy Peddler were entered into by John Nazi. Further, a letter was admitted into evidence in which John Nazi purported to be the owner of the Handy Peddler. Clearly, the evidence on this issue is sharply contested and its resolution turns on the relative credibility of the witnesses. However, from our review of the trial court's decision, and given the lack of findings contained in the order of dismissal, we discern no findings as to this particular issue. Instead, the trial court simply determined that John Nazi could not be liable because he was no longer involved with the Handy Peddler at the time the breaches occurred, which was an improper basis for the involuntary dismissal. In our view, on these sharply disputed issues of fact, the credibility of the witnesses is first to be determined by the trial court. *See Edmunds v. Delta Partners, L.L.C.*, 403 S.W.3d 812, 825 (Tenn. Ct. App. 2012) (noting that because the trial court "has the opportunity to observe the manner and demeanor of the witnesses while testifying" the trial court is "in a far better position than this Court to decide those issues"). Accordingly, we vacate the trial court's judgment and remand for reconsideration in light of the above analysis.[11]

### Fuel Surcharge

We next consider Jerry's Oil's argument that the trial court erred in awarding Ben

---

[11] We note that Mr. Gilliam, who dealt with John Nazi in signing the contracts at issue, testified that he was aware that John Nazi was merely serving as the manager of the Handy Peddler and that Ben Nazi was the true proprietor. However, this testimony was not adduced prior to the trial court's dismissal of the individual claims against John Nazi. Because we have vacated the trial court's decision to grant an involuntary dismissal on this issue, the trial court may, in its discretion, consider this evidence, as well as any other proof adduced at the hearing after the dismissal of John Nazi.

Nazi a judgment for fuel surcharges paid by the Handy Peddler. In its brief, Jerry's Oil contends that the fuel surcharges were contemplated by the contract and course of performance, and therefore, the trial court erred in finding that Ben Nazi had been improperly invoiced for this charge. In the alternative, Jerry's Oil argues that Ben Nazi's claim for the fuel surcharge is barred by the applicable statute of limitations.

We begin with Jerry's Oil's argument regarding the statute of limitations. Jerry's Oil argues that the trial court erred in awarding damages to Ben Nazi for the fuel surcharges dating back to the initiation of the contract in April 2007. Jerry's Oil asserts that the contract dispute in this case is governed by Tennessee Code Annotated Section 47-2-725, which provides, in pertinent part:

> (1) An action for breach of any contract for sale must be commenced within four (4) years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one (1) year but may not extend it.

Because Ben Nazi did not file his claim for damages until November 9, 2012, more than four years from the execution of the contract, Jerry's Oil argues that the claim is barred.

The expiration of the statute of limitations is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure. Rule 8.03 provides: "In pleading to a preceding pleading, a party shall set forth affirmatively facts in short and plain terms relied upon to constitute . . . statute of limitations, . . . and any other matter constituting an affirmative defense." "As a general rule, a party waives an affirmative defense if it does not include the defense in an answer or responsive pleading." *Pratcher v. Methodist Healthcare Memphis Hospitals*, 407 S.W.3d 727, 736 (Tenn. 2013) (citing Tenn. R. Civ. P. 12.08). In addition, the Tennessee Supreme Court has held that a party may waive an affirmative defense by failure to plead it with specificity. As explained by our Supreme Court:

> A generic invocation of the words "failure to state a claim" cannot be used as a vehicle to assert an affirmative defense. An affirmative defense must be "specifically pleaded." *George v. Bldg. Materials Corp. of Am.*, 44 S.W.3d 481, 486 (Tenn. 2001). Rule 8.03 clearly contains a "specificity requirement." *Allgood*, 309 S.W.3d at 925. Rule 8.03 requires that a party "set forth affirmatively facts in short and plain terms relied upon to constitute . . . [a] statute of repose [or statute of limitations]" defense. "Conclusory allegations" do not satisfy the specificity requirements of Rule 8.03. *ACG, Inc. v. Se. Elevator, Inc.*, 912 S.W.2d 163, 170 (Tenn. Ct. App. 1995); *see also In re*

> *Estate of Brown*, 402 S.W.3d 193, 199 (Tenn. 2013) ("[U]nlike challenges to subject matter jurisdiction which cannot be waived, defenses based on the statute of limitations are affirmative defenses that can be waived unless they are specifically pleaded."); *George*, 44 S.W.3d at 487 ("The specific pleading requirements of [Rule] 8.03 are designed to prevent trial by ambush . . . .").

*Pratcher*, 407 S.W.3d at 736. Thus, the Tennessee Supreme Court has held that an affirmative defense, such as the statutes of limitations and repose, may be waived by failure to plead facts supporting the defense. *Id.*; *Allgood v. Gateway Health Systems*, 309 S.W.3d 918, 925 (Tenn. Ct. App. 2009) ("Failure to comply with Rule 8.03 will result in a waiver of the defense."); *Barker v. Heekin Can Co.*, 804 S.W.2d 442 (Tenn. 1991) (concerning the affirmative defense of insufficiency of service of process); *see also* *Young ex rel. Young v. Kennedy*, 429 S.W.3d 536 (Tenn. Ct. App. 2013) (considering whether the statute of limitations defense was waived by failure to timely plead specific facts to support the defense).

In this case, Jerry's Oil timely raised its affirmative defense regarding the statute of limitations in its Answer. *See* Tenn. R. Civ. P. 12.08. However, we conclude that Jerry's Oil waived this defense by failure to properly plead facts to support it. Specifically, Jerry's Oil averred in its Answer that the "allegations asserted against [Jerry's Oil] are barred by the applicable statute of limitations in whole or in part." Thus, Jerry's Oil asserted no specific facts to support its invocation of the statute of limitations defense in its Answer. *See* *Pratcher*, 407 S.W.3d at 736 (citing *Allgood*, 309 S.W.3d at 925). Additionally, Jerry's Oil never attempted to amend its Answer to add additional facts to support this affirmative defense. Instead, Jerry's Oil appears to have relied on the "generic invocation of the words," *Pratcher*, 407 S.W.3d at 736, "barred by the applicable statute of limitations" to assert its defense. Moreover, from our review of the record, the issue of the statute of limitations was never argued to the trial court in any way. Instead, Jerry's Oil "conclusory" allegation in its Answer is the only mention of the statute of limitations in the trial court record. *Id.* (citing *ACG*, 912 S.W.2d at 170). Under these circumstances, we conclude that the affirmative defense of the expiration of the statute of limitations is waived.

We next consider Jerry's Oil's argument that the trial court erred in concluding that the fuel surcharge was not authorized by the contract. As this question involves the interpretation of a contract, our review is *de novo* with no presumption of correctness. *Barnes v. Barnes*, 193 S.W.3d 495, 498 (Tenn. 2006). While not incorporated by reference into the trial court's written order, the trial court did make findings with regard to this issue at the conclusion of the proof. According to the trial court:

> Now, I do feel that there was some dispute about the surcharge.

The contract doesn't call for it. If you look at the contract, it says, Make reference to Exhibit B. When you look at Exhibit B, it doesn't call it a surcharge. It talks about a . . . markup, which [a witness from Jerry's Oil] testified is figured into the [lost profits calculation], so I think that [Ben] Nazi is entitled to a credit of that surcharge of $26,182[.00].

In this case, it is undisputed that the contracts at issue do not include the term "fuel surcharge." Appellees argue that this fact is sufficient to conclude that the contract unambiguously indicates that a fuel surcharge is not authorized pursuant to the contract. In contrast, Jerry's Oil argues that the term "freight" as used in Exhibit B is unambiguous, and necessarily includes a fuel surcharge, as testified to by Mr. Wilhite. To support this argument, Jerry's Oil relies on the Tennessee Court of Appeals case of *Moore v. Moore*, 603 S.W.2d 736 (Tenn. Ct. App. 1980), which held that:

A contract must be enforced according to the ordinary meaning of its words unless both parties understand and agree at the time of the contract that its meaning is otherwise. Its ordinary meaning is that meaning which would have been derived from its words by reasonable persons dealing in the same situation as that of the contracting parties.

*Id.* at 739 (citing *Hardwick v. American Can Co.*, 113 Tenn. 657, 88 S.W. 797 (1905)). Accordingly, Jerry's Oil argues that Mr. Wilhite's testimony that the term "freight" customarily includes a fuel surcharge is sufficient to show that the charge was, in fact, authorized by the contract. However, Jerry's Oil fails to include additional language from *Moore* that is important to the resolution of this issue: "The fact that one party unilaterally conceived a peculiar meaning not shared by the other party will not avail to disturb the plain and ordinary meaning of the words of the contract." *Moore*, 603 S.W.2d at 739. In this case, both John Nazi and Ben Nazi testified that they did not believe that a fuel surcharge was authorized by the contract, or the use of the term "freight." In addition, as previously discussed, Mr. Kee, a witness from another fuel supply company, testified that his fuel company did not charge a fuel surcharge. Moreover, Mr. Gilliam testified that he was not aware that the Handy Peddler had ever contracted to pay a fuel surcharge.

The term "freight" is defined as the "compensation paid to a carrier for transporting goods." *Black's Law Dictionary* 738 (9th ed. 2009). The invoices at issue specifically charge for "Freight Gasoline" in accordance with this definition. These charges are clearly contemplated by the contract. However, the invoices also include an additional "fuel surcharge." Nothing in the contract indicates that the Handy Peddler was contracting to pay

-21-

this additional charge beyond the "freight" allowed pursuant to Exhibit B. Further, as previously discussed, both Mr. Kee and Mr. Gilliam indicated that this additional charge was not typically contemplated in a fuel supply agreement. Under these circumstances, we conclude that the contract at issue contains no provision requiring the Handy Peddler to pay a fuel surcharge to Jerry's Oil, and that the evidence in the record does not support Jerry's Oil's contention that the term "freight" unambiguously includes a fuel surcharge. Although this charge may have been intended to have been included in the contract by Jerry's Oil, there is simply insufficient evidence in the record to support it. As recently discussed by this Court:

> Courts defer to the contracting process by enforcing contracts according to their plain terms without favoring either contracting party. ***Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.***, 690 S.W.2d 231, 237 (Tenn.1985). Courts will decline to rewrite contracts made by the parties and will decline to relieve parties of their contractual obligations, absent an inability to contract or an unconscionable agreement. ***Petty*** [***v. Sloan***], 197 Tenn. [630,] 640, 277 S.W.2d [355,] 359 [(Tenn.1955) ]; ***Jaffe v. Bolton***, 817 S.W.2d 19, 25 (Tenn. Ct. App. 1991).

***Rickman v. Rickman***, No. M2013-00251-COA-R3-CV, 2013 WL 5656214, at *8 (Tenn. Ct. App. Oct. 15, 2013) (quoting ***Seraphine v. Aqua Bath Co., Inc.***, No. M2000-02662-COA-R3-CV, 2003 WL 1610871, at *8 (Tenn. Ct. App. March 28, 2003)).

Finally, Jerry's Oil argues that the trial court erred in considering the parties course of performance regarding the fuel surcharge. According to Tennessee Code Annotated Section 47-2-202:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:
>
> (a) By course of performance, course of dealing or usage of trade, pursuant to § 47-1-303; and . . . .

Thus, Jerry's Oil argues that the terms of the contract may be explained or supplemented by

evidence of the parties' course of performance. A course of performance is defined as:

> [A] sequence of conduct between the parties to a particular transaction that exists if:
>
> (1) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and
> (2) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

Tenn. Code Ann. § 47-1-303(a). Because the Appellees admit that they had been charged the fuel surcharge multiple times throughout the duration of the contract, without objecting, Jerry's Oil argues that this Court should reverse the trial court's decision to award Ben Nazi damages on this issue.

We have thoroughly reviewed the record in this case and conclude that this argument was not raised in the trial court. Nothing in Jerry's Oil's Answer to the Appellee's Complaint indicates that it intends to rely on an argument regarding the parties' course of performance. Furthermore, this argument does not appear to have been raised during trial on this cause. It is well-settled that arguments not raised in the trial court may not be raised for the first time on appeal. *See Southern Sec. Fed. Credit Union v. Cumis Ins. Soc., Inc.,* No. W2004-02700-COA-R3-CV, 2005 WL 3527662, at *7 (Tenn.Ct.App. Dec. 27, 2005) *perm. app. denied* (Tenn. June 5, 2006) ("It is well established that the appellate courts of this state will not entertain issues raised for the first time on appeal.") (citing *City of Cookeville v. Humphrey*, 126 S.W.3d 897, 905–06 (Tenn. 2004)). "Since these arguments were not made by [Jerry's Oil] in the proceedings before the trial court or ruled upon by that court, they may not be raised on appeal." *State v. Chaney*, No. W2013-00914-CCA-R9-CD, 2014 WL 2016655, at *9 (Tenn. Crim. App. May 14, 2014) (citing *State v. Johnson*, 970 S.W.2d 500, 507–08 (Tenn. Crim. App. 1996)). Therefore, we affirm the trial court's judgment in favor of Ben Nazi on the issue of the fuel surcharge.

## Conclusion

Based on the foregoing, the judgment of the Circuit Court of Madison County is affirmed in part, vacated in part, and remanded to the trial court for all further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are assessed one-half to Appellant Jerry's Oil, and its surety, and one-half to Appellees John Nazi and Ben Nazi, for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE